647 A.2d 990

**In re Appeal of V.V.P. PARTNERSHIP from the Decision of the Board of Assessment Appeals of the County of Delaware in Connection with Premises at 1440 Wallingford Road, Springfield Township, Delaware County, Pennsylvania Relating to 1991 Real Estate Assessment and all Subsequent Assessments During the Pendency of the Appeal Folio No.: 42–00–07267–08 Springfield School District and Springfield Township, Appellants.**

Commonwealth Court of Pennsylvania.

Argued Oct. 7, 1993.

Decided Sept. 1, 1994.

Reargument Denied Oct. 25, 1994.

Petition for Allowance of Appeal Denied March 15, 1995.

Mark A. Sereni, for appellants.

Joseph Patrick O'Brien, for appellee, V.V.P. Partnership.

Before DOYLE and COLINS, JJ., and DELLA PORTA, Senior Judge.

DOYLE, Judge.

This is a consolidated appeal from two orders of the Court of common Pleas of Delaware County by two taxing authorities, Springfield Township and Springfield School District (collectively, Authorities), which orders sustained the appeals of V.V.P. Partnership d/b/a/ Victoria Tennis Club (Property Owner or Taxpayer), and set the subject property's fair market value at $400,000 for the purpose of tax assessment for the tax years 1991, 1992, and 1993.

Taxpayer operates a tennis, racquetball, and squash facility located 274 feet from the intersection of Wallingford Road and Baltimore Pike which are state highways in Springfield Township, Delaware County. The lot upon which the club is located is 1.78 acres, but the usable space is severely limited by the slope of the property and the proximity of Baltimore Pike and Wallingford Road. The facility, originally constructed in 1968, consists of a main tennis court area, several squash and racquetball courts, a service core with rest rooms, a jacuzzi room, pro shop, and a utility room on the first floor. The second floor consists of two small offices, a lounge with a small service kitchen, a laundry room and a storage closet. The court area is small, and all the courts combined can only accommodate twenty-eight players at any one time. The parking lot, located a distance from the building, can only accommodate twenty-two cars. The zoning for the area is RB–Residential, and since October 1985 the property's use as a tennis, squash and racquetball facility is a previously existing nonconforming use. Moreover, the property does not comply with current setback requirements and is therefore nonconforming in this regard as well.

The Delaware County Board of Assessment Appeals determined the assessed value to be $30,000 for the 1991 tax year, based on a fair market value of $909,100. The Board denied Taxpayer's request for modification, and Taxpayer appealed to the trial court. The Authorities properly intervened.

A hearing was held, and both the Authorities and the Taxpayer presented expert testimony regarding the fair mar-

ket value of the property. The Authorities' expert, Andrew L. Mozino, testified and provided a comprehensive appraisal report wherein he concluded that the fair market value of the property was $800,000. He relied on both the "income approach"[1] and the "sales comparison approach."[2] Taxpayer's expert, Joseph F. Summers, also testified and provided an appraisal report. He concluded that the fair market value of the property was between $330,000 and $420,000, relying primarily on the income approach to establish its market value. His report also contained an analysis of the fair market value of the property under the "cost approach."[3]

The trial court found the opinion of Taxpayer's expert, Summers, to be more convincing than Authorities' expert, Mozino. The trial court reasoned that Summers' estimate of expenses incurred in the operation of the business on the property was closer to the actual expenses incurred during 1991, at 68.78% of gross income, and therefore his estimate of the fair market value based on the income approach was more accurate. Conversely, Mozino based his valuation under the

1. The income approach calculates the value of income-producing property by capitalizing the property's annual net income. Net income is derived by deducting the property's actual annual expenses from the year's gross income. *City of Wilkes–Barre Industrial Development Authority v. Board of Tax Assessment Appeals of the County of Luzerne*, 89 Pa.Commonwealth Ct. 182, 492 A.2d 113 (1985).

2. The sales comparison approach compares the subject property to other similar properties which have been sold, giving consideration to the size, age, physical condition, location, neighborhood, extra amenities, date of sale, lot size, style of building, unique features, and type of financing. *Cedarbrook Realty, Inc. v. Cheltenham Township*, 148 Pa.Commonwealth Ct. 310, 611 A.2d 335, *petition for allowance of appeal denied*, 533 Pa. 637, 621 A.2d 582 (1992). This approach is most useful for appraising residential property. *Id.*

3. The cost approach is an evaluation of the cost of reproduction or replacement, as applicable, less depreciation and all forms of obsolescence. Section 402 of The General County Assessment Law (Law), Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. § 5020–402. The reproduction cost approach estimates the cost to construct, at current prices, an exact replica of the property being appraised. *F & M Schaeffer Brewing Co. v. Lehigh County Board of Appeals*, 530 Pa. 451, 610 A.2d 1 (1992). The conventional methods to determine reproduction cost are the unit-in-place method, based upon cost estimates for major components of the property, and the engineering method, which breaks down the costs for materials and labor in great detail. *Id.*

income approach on an estimate of expenses that were only 15.05% of gross income. Moreover, his sales comparison approach analysis was based on a comparison of four properties that were not located in Delaware County and were significantly larger than the subject property. Hence, the trial court, unpersuaded by Mozino's valuation, set a fair market value of the property of $400,000. The Authorities appealed.

Our scope of review in a tax assessment appeal is narrow. A verdict of the trial court will be affirmed unless it is not supported by substantial evidence, or the court abused its discretion or made an error of law. *Cedarbrook Realty.* The trial court is the fact finder, and as such it determines the weight to be accorded to an expert witness's testimony regarding the valuation of the property. *Id.* We give the trial court's findings great deference and will not disturb its decision unless there is clear error. *Id.*

Section 402 of the Law requires property assessments to be based upon the "actual value" of the property. 72 P.S. § 5020–402. Actual, or fair market value, is defined as "the price which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied." *Buhl Foundation v. Board of Property Assessment, Appeals and Review,* 407 Pa. 567, 570, 180 A.2d 900, 902 (1962).

The Authorities sole argument is that Summers' income approach method of appraisal, using actual business income and expense figures, was in fact based on the value of the property to the current owners, a so called "value-in-use" application or theory and is thus not competent pursuant to the Supreme Court's opinion in *F & M Schaeffer,* and, therefore, the trial court's conclusion concerning the fair market value of the property is erroneous. We disagree.

*F & M Schaeffer* involved a brewery's challenge to an assessment of its property. In assessing the value of the property, the experts employed by the taxing authorities

determined that the property's highest and best use was as a "special purpose" brewery and then applied a cost approach valuation to arrive at a fair market value of $34 million. To determine the replacement costs, the taxing authorities calculated the cost of the facility based upon an industry standard of $48 per barrel of beer to be produced at the facility. They then factored out the machinery and equipment using a ratio of one third real estate to two-thirds machinery, subtracted depreciation and added the cost of the land. Using sweeping language, Justice Larsen condemned this assessment method as utilizing "value-in-use."

> Value-in-use, therefore, is *not* a reflection of fair market value and is not relevant in tax assessment cases because only the fair market value (or value-in-exchange) is relevant in tax assessment cases. Thus, we hold that a property's use and its resulting value-in-use cannot be considered in assessing the fair market value of property for tax assessment purposes in Pennsylvania. (Emphasis in original; citations omitted.)

*F & M Schaeffer*, 530 Pa. at 458, 610 A.2d at 4. However, we conclude that the Authorities' reliance on this language is misplaced for several reasons.

First, and most obviously, *F & M Schaeffer* and the case before us now are factually dissimilar because the appraisal for Taxpayer utilized the income approach and not the cost approach.[4] Second, in analyzing Summers' methodology it becomes clear that his approach was logical and reasonable, and was not in fact the equivalent of arriving at value-in-use instead of actual value, or exchange-in-exchange.

The income approach is the most appropriate method for appraising a property typically purchased as an investment, such as the tennis club, because such a property is valued by a purchaser for its ability to produce income. *Cedarbrook Realty*. Although Summers performed appraisals using all three

---

**4.** We also note that in *F & M Schaeffer* four Justices concurred in the result only; hence Justice Larsen's rationale has no precedential value, and is non-binding on this Court. *See CRY, Inc. v. Mill Service, Inc.*, 536 Pa. 462, 640 A.2d 372 (1994).

methods (cost, sales comparison and income), he testified at the hearing that he gave the most weight to the income approach.

A. I finally considered and gave most weight to the income approach, which is the most logical approach for this particular type of facility.

Q. Why is that?

A. Because basically an investment is worth what the income it can produce, period. There's nothing else there that makes it any type of—have any interest to a typical investor. So in this case I looked at and analyzed what that particular building was producing income wise to determine its value.

Notes of Testimony at 38–39. Accordingly he began his analysis with a stabilized annual income figure,[5] and deducted business expenses derived from actual expenses generated by the rental of the tennis, racquetball and squash courts to reach a net income figure.[6] Summers' use of actual income and expense figures does not amount to a value-in-use method merely because they are actual and not purely hypothetical figures. Summers testified at great length that using business income did not place a value on the property significant only to the current owner, but that it valued the property to *any* owner, since the property would only be purchased for its ability to produce income.

In his testimony, Summers explained that while business income is generally not an accepted measure of value there were sound and logical reasons for using business income in this case, such as the fact that the property was severely limited as an investment property and was currently being managed at its maximum possible efficiency. Thus, based on the unique circumstances surrounding this property (limited capacity, nonconforming zoning, high risk as a potential investment, etc.), we can not say that the trial court abused its discretion in relying on Summers' analysis, in this regard.

5. Income generated by the pro shop was properly excluded from this figure.

6. This figure was then capitalized to arrive at the final appraisal value.

*See Appeal of Marple Springfield Center, Inc.*, 530 Pa. 122, 607 A.2d 708 (1992) (economic realities of commercial real estate transactions *i.e.*, a long term lease setting rental income below current market value, can be taken into consideration in appraisal of real estate). The property was not only being put to its highest and best use, it was probably being used as its only productive use.

Authorities place much emphasis on Summers' testimony that his appraisal value could theoretically double if business income doubled. However, Summers also testified that since the tennis club was being managed at its highest level of efficiency, it was not possible for its income to double, or even increase significantly.

Q: So what you're saying then, if this Victoria Tennis Courts were to get a class A manager, as Ross Perot might say, that the income might be affected positively. . . .

A. No, I am saying here that you have to have special management, specialized management to run this particular type of facility. The implication here is that that specialized management is in place and is operating the club. That's why it's utilizing and getting the highest income you can right now. Put somebody else in there, you're probably going to get lower income.

Notes of Testimony at 51–52.

Accordingly, we find that Summers' methodology in arriving at his appraisal for the subject property was reasonable and logical given the circumstances surrounding this property, and that the trial court did not abuse its discretion in its determination of the fair market value of the property.

Affirmed.

## ORDER

NOW, September 1, 1994, the orders of the Court of Common Pleas of Delaware County in the above-captioned matters are hereby affirmed.