**WILLOW VALLEY MANOR, INC., Appellant,**

v.

**LANCASTER COUNTY BOARD OF ASSESSMENT APPEALS.**

Commonwealth Court of Pennsylvania.

Argued Sept. 9, 2002.

Decided Nov. 18, 2002.

---

James H. Thomas, Lancaster, for appellant.

Robert M. Frankhouser, Jr., Lancaster, for appellee.

BEFORE: COLINS, President Judge, FRIEDMAN, Judge, and FLAHERTY, Senior Judge.

OPINION BY President Judge COLINS.

Willow Valley Manor, Inc. (Taxpayer) appeals the order of the Court of Common Pleas of Lancaster County finalizing its determination of the fair market value and assessments of three tax parcels known as Willow Valley Manor, and Willow Valley Lakes Manor, and Willow Valley Manor North and dismissing the Taxpayer's exceptions.

The facts as found by the trial court are as follows. The Taxpayer is a not-for-profit corporate owner of three properties in Lancaster County where it operates lifecare or continuum-of-care facilities. The Taxpayer's three lifecare communities are separately assessed: Willow Valley Manor (Manor), Willow Valley Lakes Manor (Lakes), and Willow Valley Manor North (North). Each community consists of apartment-like and townhouse units and assisted living and skilled nursing facilities.

Pursuant to a resident agreement, each resident pays an entrance fee, depending on the age of the resident and type of unit he or she will occupy. The resident agreement entitles the resident to occupy a specified independent living unit; it provides a leased fee interest in the unit and entitles the resident to services, some at negotiated prices and some at variable prices.[1] Each resident also pays a monthly fee to cover maintenance and amenities. Each resident is entitled to a continuum of care, moving among independent living, assisted living, and skilled nursing care as needed. The Taxpayer is contractually obligated to provide each resident with living space and nursing care. Each resident may elect to receive a refund of up to 33 percent of the entrance fee. Under the terms of the resident agreement, the Taxpayer may terminate the agreement if the resident is unable to pay the monthly service fee. The Taxpayer reserves the right to adjust the monthly fee based on its financial needs, and it has historically increased the amount of both its entrance fees and monthly fees.

The Manor opened in 1984 and has a 9.148 percent turnover rate. Approximately 85 percent of residents elected the refund, and from 1993 to 1996, health care expense exceeded health care revenue. The Lakes facility opened in 1988, has a turnover rate of 9.132 percent, and 95 percent of residents elected the refund. From 1993 to 1996, health care expense exceeded health care revenue. The North community opened in 1993, turnover is at 2.7 percent, and 70 percent of residents

---

1. These services include from one to three meals a day, personal care, nursing care, physician care, acute hospital care, housekeeping, activities, maintenance, security, utilities, transportation, and administrative services.

elected the refund. Health care cost for 1997 was positive. As a facility ages, a greater percentage of its residents use assisted living and skilled nursing care, increasing the Taxpayer's health care expenses. Also as a facility ages, resident turnover increases, generating new entrance fees. On average, each independent living unit generates the payment of a new entrance fee every 11 years. For most types of residence units, the Taxpayer has a waiting list.

In calculating value, the Taxpayer and the School District used the capitalization of income approach, agreeing that the sales approach and cost approach were inappropriate. The School District valued the properties as unencumbered fee simple interests, whereas the Taxpayer characterized them as leased fee interests because of the long-term encumbrances created by the resident agreements. The Taxpayer examined each facility separately; the School District applied turnover and refund liability rates across the board. The Taxpayer's appraisal excluded invested entrance fees, classifying them as investment income and not part of the real estate. The School District appraisal included the entrance fees in gross revenue, which it then discounted (based on elderly housing rather than lifecare facilities) and applied the capitalization rate. Both appraisers agreed that a potential purchaser would review the facilities' financial statements, and both appraisers used the financial statements prepared by Arthur Andersen LLP to represent the value of the real estate, improvements, and buildings in terms of accumulated costs, less depreciation.

The trial court found that the highest and best use of the properties is as a continuing care community. Giving due consideration to the financial statements and the appraisers' reports, the trial judge arrived at the following fair market values: Manor, $26,800,000; Lakes, $37,200,000; and North, $50,900,000. These values reflect the court's adoption of the School District's appraisal. The trial judge denied the Taxpayer's exceptions.

■ On appeal to Commonwealth Court, the Taxpayer argues 1) that the trial court erred in determining the fair market value of the properties as fee simple interests free and clear of liens or encumbrances rather than as leased fee interests; 2) that the valuation accepted by the trial court is flawed because it failed to consider current economic realities affecting the properties' market value; and 3) that the trial court overvalued the properties by considering costs and sales comparisons, considering the value of intangible property not attributable to the real estate, and failing to adjust the value for business marketing expenses. The standard of review in a tax assessment appeal is whether the trial court abused its discretion, committed an error of law, or rendered a decision unsupported by the evidence. *Appeal of Marple Springfield Center,* 530 Pa. 122, 607 A.2d 708 (1992).

■ The trial court's duty in an assessment appeal is to weigh the conflicting expert testimony and determine a value based upon credibility determinations. *Air Products & Chemicals, Inc. v. Board of Assessment,* 720 A.2d 790 (Pa.Cmwlth. 1998). The trial court has the discretion to decide which of the methods of valuation is the most appropriate and applicable to the given property. *Id.; RAS Development Corporation v. Fayette County Board of Assessment Appeals,* 704 A.2d 1130 (Pa. Cmwlth.1997). In tax assessment appeals, actual value or fair market value is determined by competent witnesses testifying as to the property's worth in the market; i.e., the price a willing buyer would pay a willing seller, considering the uses to

which the property is adapted and might reasonably be adapted. *F & M Schaeffer Brewing Company v. Lehigh County,* 530 Pa. 451, 610 A.2d 1 (1992) (quoting *Buhl Foundation v. Board of Property Assessment,* 407 Pa. 567, 570, 180 A.2d 900, 902 (1962)). Our review in a tax assessment appeal is narrow such that the trial court's valuation will be affirmed unless its findings are not supported by substantial evidence or it abused its discretion or committed an error of law. *Appeal of Cynwyd Investments,* 679 A.2d 304 (Pa.Cmwlth.), *petition for allowance of appeal denied,* 546 Pa. 671, 685 A.2d 549 (1996). The trial court's findings are entitled to great deference, and its decision will not be disturbed absent clear error. *Id.*

The Taxpayer asserts that the trial court failed to apply the controlling law, which requires that valuation recognize and consider relevant economic realities, including that fact that the property is encumbered by long-term lease agreements. The Taxpayer directs our attention to a line of cases beginning with *In re Johnstown Associates,* 494 Pa. 433, 431 A.2d 932 (1981), which, it contends, was the basis for the Supreme Court's "landmark" decision in *Marple Springfield Center.* *Johnstown Associates* involved the valuation of a federally subsidized low-income apartment building that was both rent controlled and could not be sold for 16½ years after construction. The Court remanded after concluding that the trial court expressly rejected the consideration of the effect of rent and sale restrictions affecting the property's value. The Court re-emphasized that a property's reasonably foreseeable prospects during the assessment period, i.e., its probable return on capital, probable use and occupancy, and probable lease and/or sale, should be

considered,[2] and it remanded after concluding that the trial court gave no consideration to the "certitude of [the] property's not being presently saleable, and of its not having a potential for rental profit increases...." 494 Pa. at 438, 431 A.2d at 935.

The *Marple Springfield Center* opinion begins with a restatement of the Supreme Court's holding in *Johnstown Associates:* "sale restrictions and rent restrictions, in the context of federally subsidized low-income apartment buildings, were factors taxing authorities must use in appraising property." 530 Pa. at 123, 607 A.2d at 709. *Marple Springfield Center* involves the valuation of a shopping center that was subject to rent restriction. The taxpayer's predecessor in title entered into a thirty-year lease at a constant rate of $1.47 per square foot, with the option to renew until 2044. Concluding that this Court's interpretation of actual value to mean the value of the property in its unencumbered form ignored the economic realities of commercial real estate transactions, the Supreme Court reversed and reinstated the trial court's use of the capitalization of income approach, calling it "the most appropriate if not the only valid means of establishing fair market value of real estate when rental income is below what would otherwise be the current market level but for a long-term commercial lease, because such leases are an accepted aspect of commercial real estate transactions and their effects have a decisive impact on the price a buyer would pay for the affected property." 530 Pa. at 126, 607 A.2d at 710.

Subsequently, we have applied these principles to require the recognition of income restrictions based on contractual obligations. In *Cedarbrook Realty, Inc. v. Cheltenham Township,* 148 Pa.Cmwlth. 310, 611 A.2d 335, *petition for allowance of*

---

**2.** Quoting *McKnight Shopping Center, Inc. v. Board of Property Assessment, Appeals and Re-* view, 417 Pa. 234, 242–43, 209 A.2d 389, 393 (1965).

*appeal denied,* 533 Pa. 637, 621 A.2d 582 (1992), we concluded that the trial court erred in applying the direct sales comparison approach to value a unique luxury apartment complex with a higher-than-normal vacancy rate attributed to management decisions to maintain a certain tenant profile resulting in a higher rent structure. In *Appeal of V.V.P. Partnership,* 167 Pa. Cmwlth. 282, 647 A.2d 990 (1994), *petition for allowance of appeal denied,* 540 Pa. 615, 656 A.2d 120 (1995), we rejected the taxing authority's challenge to the trial court's adoption of the taxpayer's valuation based on actual business income and expense figures. Citing *Cedarbrook* and *Marple Springfield Center,* we validated the use of the income approach for a tennis, racquetball, and squash facility with specialized management that was determined to be operating the facility at its highest level of efficiency.

Citing these cases, the Taxpayer argues that the School District's appraisal and the trial court's valuation do not reflect the current economic realities of the real estate at issue. More specifically, it argues that the trial court failed to recognize that residents of the Willow Valley communities are entitled to lifecare, failed to consider the complex bundle of rights and obligations created by the resident agreement, failed to acknowledge that the facilities are subject to long-term leases at below-market rate (i.e., the resident agreements), and ignored the uncontroverted fact that the oldest community has the highest costs and lowest net income to be capitalized. It argues that the presence of a termination clause in the resident agreement is no more probative of the community's obligation to its residents than is the presence of a default provision in a commercial lease and that the court capriciously suggested that a buyer would treat the communities' health care obligations as a liability that could be avoided by exercise of the termi-

nation clause. Even more important, the Taxpayer argues that based on *Marple Springfield Center* and *Cedarbrook* the valuation should have been based on actual historic figures for the communities' expense ratios, entrance fees, and real estate taxes rather than on the speculative industry-standard numbers used in the School District's appraisal.

After reviewing the trial court's findings and its opinion, we must conclude that the court both recognized and considered the communities' lifecare component and the parties' rights and obligations under the resident agreement, even if it did not expressly characterize the resident agreements as long-term leases at below-market rate. The court's findings acknowledge the resident agreements as imposing long-term rent restrictions as well as the obligation to provide lifecare. The court did not determine the properties' fair market value as unencumbered fee simple interests. We find no support for the Taxpayer's assertion that the court ignored the fact that the oldest community has the highest costs and lowest net income and the youngest community the lowest costs and highest net income.

 Based on *Johnstown Associates, Marple Springfield Center, Cedarbrook,* and *V.V.P. Partnership,* we agree with the Taxpayer's assertion that the valuations should be based on a consideration of historic income figures rather than solely on industry-standard figures.

The reasonably foreseeable prospects for the property during the subject [assessment period] ... form a legitimate area of inquiry. Whatever factors are based upon a reasonable probability existing at the time of the assessment, as opposed to pure speculation, are relevant to the question of value.... While not controlling, they are not irrelevant.

*Johnstown Associates,* 494 Pa. at 438, 431 A.2d at 935 (quoting *McKnight Shopping Center, Inc. v. Board of Property Assessment, Appeals and Review,* 417 Pa. 234, 242–243, 209 A.2d 389, 393 (1965)).

Having reviewed the testimony and reports of both of the appraisers, we must conclude that the School District's appraisal on which the trial court relied was derived from historic figures on the Taxpayer's financial statements as prepared by Arthur Andersen LLP, on entrance fee data supplied by the Taxpayer, and on reasonably probable estimates based on those figures.[3] Contrary to the Taxpayer's contention, the School District appraiser did not simply ignore the facilities' historic income and expense figures in favor of speculative, industry-standard figures.

In his calculation of net operating income for each of the facilities, the School District appraiser used the supplied information where available and otherwise estimated income figures based on the supplied historic information. Although the Taxpayer argues that the trial court erroneously adopted its own method for projecting future entrance fees despite the agreement of the appraisers that entrance fee income must be based on turnover of occupied units, our review fails to substantiate that contention. Given the fact that the trial court's assessments mirror the School District appraiser's values, the trial court could not have adopted its own method for projecting entrance fee income.

■ With respect to operating expenses, the historic figures indicated operating expense ratios higher than the industry average, and the appraiser testified that he considered those figures and ap-

plied a reduced operating expense ratio that was closer to the industry average. On cross-examination, he explained:

A. First of all, the depreciation, amortization would have to be taken out of that. And I think that what you'll find is that the ratio is not as large as you make it seem. The difference between Mr. Coyle's analysis and my analysis.

First of all, you know, his—result—his operating expense ratio of 80 percent excludes taxes whereas the 60 to 65 [industry average] includes taxes and management fees. Our corresponding ratio would be 73 percent because we'd have to add back eight percent adjusting for management fee and reserve. It's 60 to 65. Which, you know, would include taxes. So you basically have a 73 percent versus an 80 percent. And as I said before, there were the two items, I think it was food service and health care, that were significantly higher at Willow Valley than they were based on the industry study.

And we think that's where the differences would be between what another typical operator might achieve and what's shown on the statements. So, you know, whether it be cuts and expenses or whether there are things buried in the expenses that are not typical, you know, I'm not going to speculate on. But I think when I see an operating expense ratio that's consistent—considerably higher than an industry study, it raises a red flag to me and historical expenses may or may not be as reliable in indicating value as utilizing the method that we've used.

(Transcript, pp. 180–81.) In estimating expenses, the appraiser should not rely

---

3. The appraiser testified that he was not provided with all of the information he requested.

solely on historic expenses, but rather must make a stabilized expense projection, considering actual expenses and industry standards.

Next the Taxpayer argues that the trial court erred in accepting the School District's use of sales comparison data for convalescent centers and nursing homes in support of its appraisal. We disagree. The record is clear that both appraisers ultimately used the capitalization of income approach to valuation and that the trial court's valuation was based on those appraisals. The fact that the School District appraiser's report included sales comparisons is irrelevant. When asked to highlight the differences in the appraisers' methodologies, he testified,

> Basically from a technical standpoint, your Honor, we ... used the same methodologies ... with the primary difference being that we developed a sales comparison approach a little bit more. When I say we developed it a little bit more, we did not formulate a value conclusion from the sales comparison approach, but we did in fact utilize some comparable sales to indicate units of comparison and unit rates to check our values by income approach to see if there were within the ranges that ... the sales comparison indicated.

(Transcript, p. 149.)

The Taxpayer argues that the trial court overvalued the Willow Valley properties by including business value not attributable to the real estate and by failing to adjust adequately for business marketing expenses. Specifically, the Taxpayer objects that the trial court assessment impermissibly captured some business value because the School District's appraiser subtracted business value and the value of personal property using a ratio chosen from an industry-standard range of 20 to 35 percent for retirement facilities, with the low end representing independent living facilities and the high end representing skilled nursing facilities. The Taxpayer argues that investment income is attributable to business value and would not be sold to a potential buyer with the real estate.

We agree that investment income is attributable to business value, but we disagree that the trial court overvalued the Willow Valley properties by including investment income and business value in the determination of fair market value. A review of the record reveals that the School District appraiser initially included investment income in his calculation of gross operating income under the category of miscellaneous income, which the appraiser estimated at 0.5 percent of gross revenue. The appraiser defined miscellaneous income as income from a variety of sources, including investments. However, the appraiser subsequently deducted from the net operating income for each facility, an amount representing business value, which included a management fee of 6 percent and 2 percent deduction representing intangibles and replacement value for furniture, fixtures, and equipment. The appraisal applied a capitalized ratio of 23 percent, representing business value and personal property. The appraiser testified that he considered the fact that the facilities contain a mixture of independent living, assisted living, and skilled nursing, and based his assessment on data indicating that the facilities were predominantly independent living facilities. The appraiser included marketing expenses in its operating expense deduction.

We agree that for valuation purposes, income should include only income attributable to the property and that business income should be excluded. Clearly, the Taxpayer appraiser's methodology differs from that of the School District ap-

praiser in that he excluded a dollar-specific amount of investment income and applied a dollar-specific adjustment for business marketing expenses. Because both appraisals made the appropriate adjustments to eliminate business value from net income and to account for marketing expense, we cannot agree that the trial court was bound to accept the Taxpayer's methodology simply because it used dollar figures rather than applying industry-standard percentages.

The trial court's valuation, which it based on the School District's appraisal, recognized and considered the long-term leases affecting the properties' market value and the properties' reasonably foreseeable prospects based on their historic financial data; however, neither the appraiser nor the trial court were bound to adopt the Taxpayer's application of the capitalization of income methodology or its dollar values for business value or marketing expense. We are convinced that the trial court's findings are supported by competent evidence and that its conclusions are consistent with the applicable law. Accordingly, the trial court's order is affirmed.

### ORDER

AND NOW, this 18th day of November 2002, the order of the Court of Common Pleas of Lancaster County in the above-captioned matter is affirmed.