**CHURCH STREET ASSOCIATES, Lock Haven Commons Associates, Lock Haven Court Corp., Woodward Meadows Associates and Rock Ledge Associates**

v.

**COUNTY OF CLINTON, Board of Assessment Appeals and Revision of Taxes**

Appeal of: Church Street Associates, Lock Haven Commons Associates, Woodward Meadows Associates, Lock Haven Court Corp. and Rock Ledge Associates.

Commonwealth Court of Pennsylvania.

Argued April 8, 2008.

Decided Sept. 30, 2008.

Reargument Denied Nov. 24, 2008.

Jacqueline E. Bedard and Raymond P. Pepe, Harrisburg, for appellants.

Lewis G. Steinberg, Lock Haven, for appellee, County of Clinton.

Anthony T. McBeth, Harrisburg, for amicus curiae, County Commissioners Association of Pennsylvania.

BEFORE: FRIEDMAN, Judge, and COHN JUBELIRER, Judge, and KELLEY, Senior Judge.

OPINION BY Senior Judge KELLEY.

Church Street Associates, Lock Haven Commons Associates, Lock Haven Court Corporation, Woodward Meadows Associates, and Rock Ledge Associates (collectively, Taxpayers) appeal from an order of the Court of Common Pleas of Clinton County (Trial Court) that denied Taxpayers' appeals from their respective tax assessments as performed by the Clinton County (County) Board of Assessment and Revision of Taxes (Board). We affirm.

The assessments at issue involve four properties and five parcels of land,[1] consol-

---

1. Lock Haven Common Associates (Lock Ha-       ven) is comprised of two separate parcels,

idated for purposes of the hearing before the Trial Court. Each of the four properties is an apartment complex for low income or elderly renters, and each receives funding through state or federal programs. Three of the four properties—those owned by Woodward Meadow Associates (Woodward), Rock Ledge Associates (Rock Ledge), and Church Street Associates (Church Street)—are governed by the rules and regulations adopted by the U.S. Department of Agriculture for what is commonly referred to as the Section 515 Rural Rental Housing Program (hereinafter, Section 515).[2] The fourth property, owned by Lock Haven, is governed by the rules and regulations pertaining to the Rental Housing Program of the Pennsylvania Housing Finance Agency (PHFA).[3]

The Board originally issued the following Fair Market Values (FMV) and assessments for the properties at issue:

| Property | FMV | Assessment |
|---|---|---|
| • Woodward Meadows | $1,760,821.00 | $471,900.00 |
| • Church Street | $1,655,600.00 | $443,700.00 |
| • Lock Haven | $1,260,299.00 | $337,760.00 |
| • Rock Ledge | $1,602,873.00 | $429,570.00 |

Following the Board's assessments, Taxpayers appealed and the Board thereafter held hearings at which each Taxpayer was represented by counsel and presented evidence. By Final Determinations and Orders, all dated October 28, 2005, the Board denied each Taxpayer's appeal.

On November 28, 2005, Taxpayers each filed in the Trial Court an appeal from the Board's Final Determinations and Orders. Thereafter, the parties agreed to consolidation of their respective appeals due to the common factual and legal issues. The parties further agreed that the determination of the value for Woodward Meadows would establish a methodology that would be extrapolated to the other properties, which are all federally subsidized units. The parties also agreed that the analyses of Taxpayers' and the Board's appraisers would apply to each of the other three properties. Although both parties' appraisers used the income approach, each differed as to the appropriate mortgage interest rate in determining the capitalization rate. Taxpayers' appraiser, Alan Kaplan, applied the 9% interest rate set forth in the applicable loan documents, resulting in an overall capitalization of 12.1% and an FMV of $550,000. The Board's appraiser, Richard Drzewiecki, used a 1% rate after effectively reducing the 9% rate due to the rental subsidy received under the relevant government program. His calculations resulted in a capitalization rate of 4.58% and an FMV rounded to $1,560,000.00. Drzewiecki also considered a sales comparison approach resulting in an FMV of $1,344,000.00. Reconciling those two approaches, Drzewiecki arrived at a final FMV for Woodward Meadows of $1,450,000.00.

and its appeal of the one apartment complex thereon was docketed by the Trial Court at two separate docket numbers.

2. *See* Housing Act of 1949, § 515, 42 U.S.C. § 1485 (2000); 7 C.F.R. § 3560.1 (2005). The Section 515 Program is a direct loan program providing, *inter alia*, low interest loans in return for renting to low income persons, under Federal regulations. Through the loan agreements, the developer agrees to participate in the program for a period of 30 to 50 years. The program limits both rent charges to tenants, and the total rental rate

that can be earned. The Federal Tax Reform Act of 1986 created the Low Income Housing Tax Credit (LIHTC), allocating certain tax credits to states. In Pennsylvania, the Pennsylvania Housing Finance Agency administers the LIHTC program and allocates credits over a ten-year period to developers who acquire, construct, or rehabilitate affordable rental housing.

3. *See* the Housing Finance Agency Law (HFAL), Act of December 3, 1959, P.L. 1688, *as amended*, 35 P.S. §§ 1680.101–1680.603.

The Trial Court adopted the 1% interest rate to be used to determine the capitalization rate, and adopted the Board's findings of fact. In its order, the Trial Court used the thus-derived FMVs, applied the common level ratio of 26.8% thereto, and produced the following assessed values:

| Property | FMV | Assessment |
|---|---|---|
| • Woodward Meadows | $1,450,000.00 | $388,600.00 |
| • Church Street | $1,475,000.00 | $395,300.00 |
| • Lock Haven | $1,330,000.00 | $356,440.00 |
| • Rock Ledge | $1,460,000.00 | $391,280.00 |

Taxpayers timely appealed the Trial Court's order, dated September 18, 2007, to this Court. The County Commissioners Association of Pennsylvania (Association) has submitted an Amicus Curiae brief in support of the County's position.

■ This Court's standard of review in a tax assessment appeal is whether the trial court abused its discretion, committed an error of law, or rendered a decision unsupported by the evidence. *Willow Valley Manor, Inc. v. Lancaster County Board of Assessment*, 810 A.2d 720 (Pa. Cmwlth.2002), *petition for allowance of appeal denied*, 572 Pa. 769, 819 A.2d 549 (2003).

■ Pennsylvania's General Assembly has enacted statutes providing guidance as to the valuation and assessment of properties. Section 402(a) of The General County Assessment Law (Assessment Law), Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. § 5020–402(a), provides for the consideration of three valuation approaches:

(a) It shall be the duty of the several elected and appointed assessors, and, in townships of the first class, of the assessors, assistant township assessors and assistant triennial assessors, to rate and value all objects of taxation, whether for county, city, township, town, school, institution district, poor or borough purposes, according to the actual value thereof, and at such rates and prices for which the same would separately bona fide sell. In arriving at actual value the county may utilize either the current market value or it may adopt a base year market value. In arriving at such value the price at which any property may actually have been sold either in the base year or in the current taxable year, shall be considered but shall not be controlling. Instead such selling price, estimated or actual, shall be subject to revision by increase or decrease to accomplish equalization with other similar property within the taxing district. In arriving at the actual value, all three methods, namely, cost (reproduction or replacement, as applicable, less depreciation and all forms of obsolescence), comparable sales and income approaches, must be considered in conjunction with one another. Except in counties of the first class, no political subdivision shall levy real estate taxes on a county-wide revised assessment of real property until it has been completed for the entire county.

Additionally, Section 402(c) of the Assessment Law, 72 P.S. § 5020–402(c), addresses the consideration of restrictions and credits such as those at issue in the instant matter:

(c) (1) In arriving at the actual value of real property, the impact of applicable rent restrictions, affordability requirements or any other related restrictions prescribed by any Federal or State programs shall be considered.

(2) Federal or State income tax credits with respect to property shall not be considered real property or income attributable to real property.

(3) This subsection shall apply in all counties and other political subdivisions in this Commonwealth.

Under the precedents of our Courts, an appraiser is required to consider factors that limit the income of the property. In *In re Appeal of Johnstown Associates,* 494 Pa. 433, 431 A.2d 932 (1981), the Supreme Court held that an appraiser must take into consideration the current economic realities of a subject property, including any rental or transfer restrictions imposed pursuant to a subsidized low income rental property. Restating its holding therein, the Supreme Court stated in *In re Appeal of Marple Springfield Center, Inc.,* 530 Pa. 122, 123, 607 A.2d 708, 708 (1992), *petition for allowance of appeal denied,* 542 Pa. 679, 668 A.2d 1140 (1995), that "sale restrictions and rent restrictions, in the context of federally subsidized low-income apartment buildings, were factors taxing authorities must use in appraising property." Therein it was also held that there is no "meaningful distinction between income restrictions based on applicable federal regulations and those based upon bona fide contractual obligations." *Marple,* 530 Pa. at 126, 607 A.2d at 709; *see also Cedarbrook Realty, Inc. v. Cheltenham Township,* 148 Pa.Cmwlth. 310, 611 A.2d 335 (1992), *petition for allowance of appeal denied,* 533 Pa. 637, 621 A.2d 582 (1992).

■ In its first argument on appeal, Taxpayers argue that the Trial Court erred in its use of subsidized rental units other than Section 515 units, for purposes of conducting a comparable sales approach to valuation. Taxpayers assert that encumbrances imposed by Section 515 distinguish those properties from market rate properties, and from properties receiving support from the Federal Housing and Urban Development Department (HUD) under its applicable programs. Taxpayers

further emphasize, as distinguishing factors, Section 515's imposition of construction requirements, requirement of funding contributions, mandate of sufficient reserve accounts, limitation of development costs, and limitation of a property's annual return, as well as numerous other restrictions including property transfer limitations. Taxpayers also argue that, similar to Section 515, the PHFA established in Pennsylvania a Rental Housing Program providing low cost development loans to promote low-income housing, with available tax credits pursuant to the LIHTC. As with Section 515, significant restrictions and conditions also attach to the PHFA Program, including a regulatory agreement, an indenture of restrictive covenants, construction requirements, operating fund contributions, the establishment of sufficient reserves, limited development costs, and equity return limitations.

We first note that Taxpayers fail to acknowledge that comparable sale property No. 1, as utilized by Drzewiecki, the Board's appraiser, was in fact initially a Section 515 property which was later converted to a HUD subsidized program, which Drzewiecki acknowledged and for which he compensated. Reproduced Record (R.R.) at 87a; 94a–95a; 1140a; 1459a; 1726a; 1854a.[4] Additionally, the record is clear that all of the comparables used by Drzewiecki in his valuations were subsidized with low-income restrictions under Federal programs, with the subsidized program differences between the comparables used and the subject properties anticipated in his approach and compensated for through adjustments. R.R. at 85a–95a. The similarities and differences between each of the other comparable sales, and

4. The records beginning at R.R. 1140a, 1459a, 1726a, and 1854a constitute the expert reports submitted by the County, in the form of the assessments and related materials compiled and relied upon by Drzewiecki, and will hereinafter be collectively referred to as "Co. Ex. Rpts."

the instant subject properties, were expressly and clearly explained by Drzewiecki. R.R. at 87a–95a; Co. Ex. Rpts. Taxpayers misstate our prior precedents in this area by impliedly arguing that the properties used in comparable sales valuation need to be identical; that proposition is without support in our case law.

■ We have previously held:

The trial court's duty in an assessment appeal is to weigh the conflicting expert testimony and determine a value based upon credibility determinations ... The trial court has the discretion to decide which of the methods of valuation is the most appropriate and applicable to the given property.

*Willow Valley*, 810 A.2d at 722–23. As such, the Trial Court's resolution of the conflicts within the two experts' testimony, as well as the weight assigned respectively thereto and the credibility determinations thereof, control on appeal. *Id.; accord Cedarbrook.* As noted above, the extensive testimony of record establishes that Drzewiecki used one comparable Section 515 property, and compensated for both the other comparable subsidized programs, and the Section 515 property's conversion to a HUD subsidy, through adjustments directed at any dissimilarities. Given that evidentiary foundation, combined with the Trial Court's proper exercise of its discretion as the fact finder herein, the valuation approach accepted by the Trial Court will also control on appeal. *Willow Valley; Cedarbrook.*[5]

■ Next, Taxpayers argue that the Trial Court erred, in conducting the income approach to valuation, by failing to take into consideration the restrictions of use on the income generated by a property as imposed by Section 515 and the PHFA. Taxpayers assert that the Trial Court ignored the PHFA Program limitations on the annual income returned to Taxpayers, and that the Trial Court should have considered not only the restrictions on rent, but also the restricted return on Taxpayers' investment. Taxpayers argue that the Trial Court did not consider these strict limitations, and treated the total amount of income generated by the properties as earnings available for withdrawal by Taxpayers. Based upon these assertions, Taxpayers argue that it was error for the Trial Court to not make an adjustment to reflect these limitations, and to disregard Taxpayers' preferred approach of increasing capitalization rates, to achieve this result. The voluminous record in general, and Drzewiecki's testimony specifically, belie these arguments.

We first note that the Trial Court's failure to expressly recite the restrictions and limitations cited by Taxpayers on this issue is not dispositive. While the Trial Court's abbreviated opinion in this matter may not have articulated the factors that Taxpayers now assert were not properly compensated for, those restrictions and limitations were acknowledged, considered,

---

5. Additionally, Taxpayers argue that our holding in *Cedarbrook* buttresses their appeal. In brief, Taxpayers assert that in *Cedarbrook*, this Court found error where the sales comparable approach was employed despite a lack of sufficiently similar properties. Herein, Taxpayers assert, the Section 515 and PHFA restrictions are unique to the properties at issue—and specifically, distinct from applicable HUD restrictions—and thus, it is inappropriate to compare them to prop-

erties not subject to the same major restrictions. We reject Taxpayers construal of our holding in *Cedarbrook* as applied to the facts *sub judice.* Unlike the facts of that precedent, the comparable properties used in this matter were subsidized rental properties, albeit subsidized under different programs. This relevant fact renders the narrow portion of *Cedarbrook* relied upon by Taxpayers in its argument on this issue unpersuasive as applied to the actual facts before this Court.

and utilized by Drzewiecki as demonstrated by the record herein. Drzewiecki expressly acknowledged that the subject properties are not market rate properties, an acknowledgment that guided his calculations and adjustments. R.R. at 86a, 90a, 92a–93a, Co. Ex. Rpts. Further, Drzewiecki acknowledged the requirement that said restrictions, under applicable Pennsylvania law, cannot be ignored in appraiser valuation. *Id.* Additionally, and contrary to Taxpayers' assertions, Drzewiecki acknowledged his compensation and adjustments for the restricted return on taxpayer's investment, and their limited return on equity. R.R. at 90a–95a. As such, neither Drzewiecki in his testimony and preparation of his expert reports, nor the Trial Court in accepting Drzewiecki's testimony and reports, erred by failing to make adjustments reflecting these limitations in Drzewiecki's approach to developing the applied income approach to valuation. Again, given the evidence of record, we will not disturb the Trial Court's proper exercise of its discretion as the fact finder. *Willow Valley; Cedarbrook.* The Trial Court properly considered the economic realities of the properties at issue, which consideration expressly included rent controls, subsidies, and sale restrictions pursuant to the general principles of the Law, *Johnstown Associates,* and *Marple.*

∎ Finally, Taxpayers argue that the Trial Court erred in establishing the capitalization rate at issue. The general gravamen of Taxpayers' argument on this issue is its assertion that the Trial Court made a fundamental error in failing to comprehend the transfer restrictions on the subject properties. Taxpayers argue that the approach adopted by Drzewiecki

ignored the economic realities of the investment options for any potential purchaser, and generally failed to recognize the unique status of these properties within the market place, most importantly the restrictions of Section 515 and the PHFA Program on the transfer of the subject properties. To the extent that Taxpayer's overlapping arguments on this point have not been addressed in our foregoing analyses, we address the remaining specifics of this issue.

∎ We recognize the validity of Taxpayers' general assertion that an appraiser is obligated to adjust the value of a property to reflect unique or atypical financing. *See generally Marple; Johnstown Associates.* We disagree, however, that the Trial Court ignored this tenet, and in error valued the properties in a hypothetical unencumbered form contrary to law. *Cedarbrook.* Again, the evidence of record in this matter contradicts Taxpayer's position on this issue.

We agree with both the Trial Court, and the County, that the critical difference herein is between the two appraisers' approaches, and concomitant testimony, as to whether to apply the mortgage interest rate of 9% (Taxpayers/Kaplan), or the effective interest rate of 1% (the County/Drzewiecki), in determining the capitalization rate to be used. The Trial Court accepted the testimony, and interest rate, offered by Drzewiecki.[6] The basis for the experts' differences is, fundamentally, found in their respective definitions of fair market value. Kaplan applied the definition used by the Uniform Standards of Professional Appraisal Practice, which includes as a condition:

---

6. We note that, contrary to Kaplan's relative lack of experience in performing assessments for tax assessment appeals, Drzewiecki is a Certified Pennsylvania Evaluator, certified to appraise property for real estate tax purposes, with extensive experience in tax assessment appeals. R.R. at 85a, 125a.

The price represents the normal consideration of the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

R.R. at 99a. This definition of FMV is not the one adopted by our Supreme Court specifically for Pennsylvania tax assessment appeals, which reads:

[M]arket value has been defined as the price which a purchaser, willing but not obligated to buy, would pay an owner, willing but not obligated to sell, taking into consideration all uses to which the property is adapted and might in reason be applied.

*Buhl Foundation v. Board of Property Assessment*, 407 Pa. 567, 570 180 A.2d 900, 902 (1962) (additional citation omitted); R.R. at 1152a.

Proceeding therefrom, the evidence of record establishes that Drzewiecki's testimony as a whole, as well as the County's Expert Reports, contradict Taxpayer's general assertions. *See* R.R. at 84a–95a; Co. Ex. Rpts. Kaplan did not consider or incorporate the long-term, assignable interest rate of (effectively) 1%, which he considered "special financing" under his FMV definition. Drzewiecki considered and incorporated this 1% rate as a market factor which a purchaser would consider. This is the basis of the experts' differing conclusions as to the FMV based upon an income analysis.

Of dispositive import, Kaplan's use of the market interest rate in his determination of the capitalization rate ignores the $84,000 subsidized credit that runs with this property. This exclusion skews his analysis, since that $84,000 credit should be counted as income, thereby significantly raising the net operating income. Adding the $84,000 annual subsidized credit to the net operating income, and applying the 9% interest rate, would have an effect on the

capitalization rate identical to that arrived at by Drzewiecki in his calculations that did not include the $84,000 as income using the 1% effective interest rate. Taxpayers, in their argument to this Court, inaccurately and repeatedly represent that Drzewiecki included the $84,000 credit as income; his testimony is to the contrary.

Additionally, Drzewiecki gave no consideration to the Federal or State tax credits received by Taxpayers, but did consider the applicable rent restrictions, affordability requirements, and other related restrictions. This did not preclude Drzewiecki from recognizing and factoring the corresponding low interest rate. To not consider this rate, which can clearly be seen as an obvious inducement for the projects at issue, results in an artificially low valuation, such as that arrived at by Kaplan.

*Johnstown Associates*, and *Marple* in applying that precedent, dealt with the same issues herein, and preceded Section 704 of the Assessment Law, 72 P.S. § 5453.704, which essentially codified their holdings. Under those precedents as applied herein, Drzewiecki valued the properties as they were, whereas, contrary to Taxpayers' assertion on this point, Kaplan used a hypothetical method of valuation which ignored the economic realities of the properties.

Despite Taxpayers' arguments, there is no evidence of record suggesting that ownership or transfer of these properties would be onerous and/or preclude a willing purchaser from qualifying. Drzewiecki's assertion that the existence of a 1% assumable loan has a positive effect on the price one would pay for a property is self evident.

As noted in our foregoing analysis, the Trial Court properly considered the economic realities of the properties at issue, including all relevant subsidies and sale

restrictions, pursuant to the general principles of the Assessment Law, *Johnstown Associates*, and *Marple*. As such, the Trial Court did not err in its adoption of the capitalization rate at issue.[7]

Accordingly, we affirm.

### ORDER

AND NOW, this 30th day of September, 2008, the order of the Court of Common Pleas of Clinton County in the above-captioned matter, dated September 18, 2007, is affirmed.

---

**7.** Although, under the narrow facts *sub judice*, this is a case of first impression in Pennsylvania, the Supreme Judicial Court of Maine has addressed this very issue. *See Glenridge Development Company v. City of Augusta*, 662 A.2d 928 (Me.1995). That precedent is, foundationally, on point with the instant matter and persuasive, and our analysis herein is buttressed by our esteemed colleagues' adoption of a valuation approach for subsidized properties for tax assessment purpose that parallels the approach adopted by the Trial Court in this matter.