Opinion filed April 26, 2012



In The

# Eleventh Court of Appeals

_____

No. 11-10-00115-CV

_____

CENTRAL APPRAISAL DISTRICT OF TAYLOR COUNTY, Appellant

V.

WESTERN AH 406, LTD., Appellee

On Appeal from the 104th District Court

Taylor County, Texas

Trial Court Cause No. 22,974-B

## O P I N I O N

This is a property tax dispute. Western AH 406, Ltd. (Western) owns the 406-unit Quail Hollow apartment complex in Abilene, Texas. Western filed this suit against the Central Appraisal District of Taylor County (TCAD) disputing TCAD's appraised values of Quail Hollow for the tax years 2002 through 2004. Following a bench trial, the trial court entered a final judgment in January 2005 that Western take nothing on its cause of action and ordered that the appraisal rolls reflect the market value for Quail Hollow as was determined by TCAD.

Western appealed from the trial court's judgment. We reversed the judgment of the trial court and remanded the case for a new trial in *Western AH 406 Ltd. v. Central Appraisal District of Taylor County*, 213 S.W.3d 544 (Tex. App.—Eastland 2007, pet. denied). We will refer to Western's earlier appeal in this case as *Western I*. On remand, Western challenged TCAD's appraised values of Quail Hollow for the years 2002 through 2009. Following a jury trial, the jury found that the values of Quail Hollow for the years 2002 through 2008 were the same as those described in the September 29, 2009 appraisal of Western's expert appraiser, Gerald A. Teel. The parties stipulated that the value for 2009 would be the same as the value found for 2008. The trial court entered judgment in Western's favor in accordance with the jury's verdict. The trial court also awarded attorney's fees to Western. TCAD appeals the trial court's judgment.

We find that the testimony of Western's appraiser was legally insufficient to support the jury's findings. Although there was some evidence of Quail Hollow's market value, the evidence did not conclusively establish the market value. Therefore, we reverse and remand.

*The Subject Property*

Quail Hollow is a privatized military housing complex. It was designed for the purpose of providing housing for Dyess Air Force Base personnel on a preferred basis. Western constructed Quail Hollow pursuant to a contract with the United States Air Force. The contract documents between Western and the Air Force contained a number of components, including, among other things, (1) a Declaration of Restrictive Covenants and Use Agreement (Use Agreement), (2) a Lockbox Agreement, and (3) Direct Loan Documents (Loan Agreement) relating to a loan from the Air Force to Western.

Western obtained an interim construction loan from Chase Manhattan Bank for the purpose of constructing Quail Hollow. Construction of Quail Hollow was completed in 2002. Pursuant to the Loan Agreement, the Air Force loaned money to Western to pay off the Chase Manhattan loan. Western executed a Multifamily Note and a Deed of Trust in connection with the loan. As evidenced by the note, the terms of the loan were favorable to Western.

Quail Hollow consists of two- and three-bedroom apartments and townhouses. The apartments and townhouses were built for targeted classes of military personnel. The Use Agreement limits the amount of rent that may be charged to targeted military tenants. The Use Agreement also restricts Quail Hollow's occupancy because it requires Western to give priority

to targeted military personnel when leasing vacant units. If Western cannot rent a vacant unit to a targeted tenant, it may lease the unit to another prospective tenant based on an order of preference of tenants that is stated in the Use Agreement. The rent and occupancy restrictions were the subject of our opinion in *Western I.*

## *Western I*

Western's expert, Gerald A. Teel, of the Gerald A. Teel Company, Inc., appraised Quail Hollow in 2004. He prepared a summary report of his appraisal, dated June 24, 2004. In the report, Teel arrived at retrospective values of Quail Hollow as of January 1, 2002, and as of January 1, 2003. Teel stated in his report that "the retrospective values have been computed using the rental restrictions in place but without the favorable financing that the developer received to make the project financially feasible." Teel further stated that "[t]hese values will be with rental restrictions and hypothetical market financing in place."

TCAD moved for partial summary judgment in *Western I.* In its motion, TCAD contended, in part, that the rent and occupancy restrictions established for Quail Hollow in the Use Agreement could not be considered when determining the market value of Quail Hollow. TCAD contended that "[s]uch a property must be appraised as though it were leased at market rental rates or available to lease at market rental rates."

In *Western I*, the trial court granted TCAD's motion for partial summary judgment. The trial court's summary judgment order stated that the agreements between Western and the Air Force were not to be considered in the appraisal of Quail Hollow, that the leases of apartments at "rental rates that differ from market rental rates for comparable apartments in the local area are not to be considered" in the appraisal of Quail Hollow, and that "[Quail Hollow] shall be appraised at its value indicated by the market notwithstanding any voluntarily entered agreements restricting rents or otherwise placing non-market conditions on [Quail Hollow]." Following a bench trial in *Western I*, the trial court entered a final judgment against Western and ordered that the appraisal rolls reflect the market value of Quail Hollow as was determined by TCAD for tax years 2002, 2003, and 2004.

Western appealed the trial court's final judgment. On appeal, Western asserted that Quail Hollow's rent and occupancy restrictions were individual characteristics of Quail Hollow that had to be considered in determining its market value. Western contended that the provisions of the Texas Tax Code and the Uniform Standards of Professional Appraisal Practice (USPAP)

3

required the appraisers to consider the rent and occupancy restrictions in appraising Quail Hollow and that the trial court had erred by determining that comparable properties with similar rent restrictions could not be considered in appraising Quail Hollow. Western requested us to find that the "rent and occupancy restrictions are individual characteristics that must be considered in determining market value."

In our opinion, we stated that "[t]he Air Force and Western [had] entered into a contract that established the maximum amount of rent charged to Air Force personnel based upon the Air Force's Basic Allowance for Housing" and that "[t]he contract also restrict[ed] the occupancy of the apartment complex with priority being given to Air Force personnel." *Western*, 213 S.W.3d at 545. We quoted Section 23.01(b) of the Texas Tax Code, which currently states in relevant part as follows:

> The market value of property shall be determined by the application of generally accepted appraisal methods and techniques. . . . The same or similar appraisal methods and techniques shall be used in appraising the same or similar kinds of property. However, each property shall be appraised based upon the individual characteristics that affect the property's market value, and all available evidence that is specific to the value of the property shall be taken into account in determining the property's market value.

TEX. TAX CODE ANN. § 23.01(b) (West Supp. 2011). We explained that "[t]he question before us [was] whether the agreements between Western and the Air Force that restrict the occupancy and rent of the apartment complex are 'individual characteristics' that must be considered in determining the market value of the property." 213 S.W.3d at 546.

In *Western I*, we cited USPAP Rule 1-2(e) (2004). It provides that an appraiser must "identify the characteristics of the property that are relevant to the purpose and intended use of the appraisal." *See* USPAP Rule 1-2(e). These characteristics include "any known easements, restrictions, encumbrances, leases, reservations, covenants, contracts, declarations, special assessments, ordinances, or other items of a similar nature." USPAP Rule 1-2(e)(iv). We concluded as follows:

> [T]he agreements between Western and the Air Force are individual characteristics of the property to be considered in determining the market value of the property. Therefore, the trial court erred in ordering that the property be appraised without considering the agreements restricting the rent and occupancy of the property. . . . The trial court's final judgment determined the market value of the property based upon TCAD's appraisal that does not include the effect of

4

the agreements between the Air Force and Western restricting rent and occupancy.

213 S.W.3d at 546–47. Therefore, we reversed the trial court's judgment, and we remanded the case to the trial court for further proceedings.

The issue that we determined in *Western I* was whether the rental and occupancy restrictions were individual characteristics of Quail Hollow that had to be considered in determining Quail Hollow's market value. We specifically noted in our *Western I* opinion that the trial court's summary judgment order did not address the favorable financing terms that Western received in connection with its loan from the Air Force and that, therefore, "the question of whether the favorable loan contract must also be considered in determining the market value of the property [was] not before us." *Western*, 213 S.W.3d at 547 n.2.

*Appraisals after Remand*

Western disputed TCAD's appraised values of Quail Hollow for tax years 2002 through 2009. Teel performed another appraisal for Western in 2009. He prepared a summary appraisal report, dated September 29, 2009. After the remand of this case, TCAD retained Dale A. Scoggins of Tierra Realty Services, LLC, as its expert appraiser. Scoggins appraised Quail Hollow, and he prepared a summary appraisal report, dated January 4, 2010. In performing their appraisals, Teel and Scoggins both considered the effect of the rental and occupancy restrictions on Quail Hollow's market value. Teel and Scoggins arrived at opinions of Quail Hollow's retrospective market values for the years 2002 through 2008.[1]

Both Teel and Scoggins used the direct capitalization method of the income approach of appraisal to determine retrospective market values of Quail Hollow for the years in question. Generally, under this method, a property's net operating income (NOI) is divided by an applicable market capitalization rate (cap rate) to arrive at a market value for the property. In this case, Teel and Scoggins arrived at very similar NOIs and market cap rates for each of the years. However, their appraised values for each year differed by millions of dollars for three primary reasons: (1) Teel added an additional 2.5% "restriction premium" to his market cap rate for each year because he equated Quail Hollow with a low-income housing project; (2) Teel reduced his indicated value (Quail Hollow's NOI divided by his cap rate) by 40% for each year

---

[1]Scoggins also arrived at a value opinion for 2009. Ultimately, the parties stipulated that the value found for Quail Hollow for 2008 would also be the value for 2009. Therefore, we need not discuss Scoggins's value opinion for 2009.

based on his interpretation of the Lockbox Agreement; and (3) Scoggins added the value of Western's favorable financing from the Air Force to his indicated value (Quail Hollow's NOI divided by his cap rate) for each year. Scoggins gave another opinion of value for each year that did not include the value of the favorable financing.

Western also retained Ronald P. Little of National Realty Consultants as an expert. At Western's request, Little performed a review of Teel's appraisal. Little did not perform an independent appraisal of Quail Hollow. Little prepared a report of his review of Teel's appraisal, dated November 19, 2009. Little concluded that Teel used appropriate methodologies and techniques and arrived at appropriate opinions of market value in his 2009 appraisal of Quail Hollow.

*Pretrial Motions to Exclude Expert Testimony*

In pretrial motions to exclude testimony, TCAD lodged *Daubert/Robinson* challenges to expert testimony from Teel regarding his value opinions and to expert testimony from Little regarding his opinions as to the appropriateness of Teel's appraisal and conclusions. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995). In a pretrial motion to exclude testimony, Western lodged a similar challenge to expert testimony from Scoggins regarding his value opinions. The trial court conducted a *Daubert* hearing on the parties' motions. At the hearing, the parties agreed that the outcome of TCAD's motion to exclude Little's testimony depended on how the trial court ruled on TCAD's motion to exclude Teel's testimony. Following the hearing, the trial court found that the opinions of Teel and Scoggins were relevant and reliable. Therefore, the trial court denied the *Daubert/Robinson* challenges to their testimony and the motions to exclude their testimony. Based on its finding as to Teel, the trial court also denied the motion to exclude Little's testimony.

*Issues on Appeal*

TCAD presents five issues for review. In its first issue, TCAD contends that Teel's value opinions were "so flawed" that they were unreliable and, therefore, constituted no evidence of probative value. Specifically, TCAD argues, among other things, that Teel's value opinions were flawed and unreliable because (1) he incorrectly interpreted the Lockbox Agreement and, therefore, erroneously deducted 40% of each year's property values; (2) he improperly equated Quail Hollow to low-income housing apartments and, therefore, unjustifiably added a 2.5%

"restriction premium" to his yearly cap rates; and (3) he failed to account for the effect of Western's favorable loan contract on Quail Hollow's value in his yearly value conclusions. Because Teel's value opinions were unreliable, TCAD argues (1) that the trial court erred by failing to exclude Teel's testimony, appraisal report, and conclusions of value and Little's testimony and report of his review of Teel's appraisal and (2) that no evidence supports the jury's verdict. In its second issue, TCAD contends that the trial court erred by failing to exclude Little's report and testimony because he did not perform an appraisal of Quail Hollow and because his sole function in testifying was to bolster and validate Teel's unreliable opinions. In its third issue, TCAD contends that the trial court erred by denying its motion for JNOV and motions for new trial. In its fourth issue, TCAD contends that the trial court erred by refusing to submit its requested jury instructions that would have corrected Teel's erroneous interpretation of the Lockbox Agreement and his erroneous classification of Quail Hollow as low-income housing. In its fifth issue, TCAD contends that the trial court erred by awarding attorney's fees to Western.

*The Evidence at Trial*

The Use Agreement, Loan Agreement, and Lockbox Agreement were introduced into evidence. The term of the Use Agreement began on September 27, 2000. The termination date for the Use Agreement was defined as "the fortieth (40th) anniversary of the Final Project Compliance, unless the term of this Use Agreement is extended as provided herein or this Use Agreement has been earlier terminated." Final Project Compliance occurred in 2002 and, therefore, the Use Agreement is scheduled to terminate in 2042.

Western and the Air Force declared in the Use Agreement that they understood and intended that "the restrictions set forth in this Use Agreement: (a) burden and touch and concern the Land, (b) enhance and increase the enjoyment and use of the property by and on behalf of Target Tenants, and (c) further the purposes for which [Western] was provided with permanent financing and other assistance by the Air Force." The apartments and townhouses in the Quail Hollow complex were referred to as "Housing Units" in the Use Agreement. The apartments were built for targeted classes of enlisted military personnel (E-1 through E-4), and the townhouses were built for targeted classes of enlisted personnel (E-5 and E-6) and officers (O-1 through O-3). In the Use Agreement, the Air Force agreed that the Dyess AFB Housing Office would refer Target Tenants who contacted it to Western for rental of the Quail Hollow units.

7

Under the Use Agreement, the monthly rent charged to a Target Tenant cannot exceed the tenant's "Housing Allowance," less a "Utility Allowance." The term "Housing Allowance" is defined as "the Basic Allowance for Housing (BAH), with dependents, or such other sum as is allotted to each service member by the Government to cover the cost of housing to be used as a personal residence, as such amount is established and published by the Government in the Federal register or elsewhere." If Western is unable to rent a vacant unit to a Target Tenant, Western may lease, upon proper notice to the Air Force, the unit to other prospective tenants in an order of preference.

Scoggins testified that, by 2007 and 2008, BAH rates exceeded market rental rates for apartments in the area. He said that, at that time, management at Quail Hollow responded to the "softening market" by offering rental rates at Quail Hollow that were less than the BAH. Scoggins said that, therefore, during 2007 and 2008, the rental rates at Quail Hollow were similar to market rental rates.

Western's interim construction loan from Chase Manhattan was in the amount of $28,850,000. After construction was completed, and pursuant to the Loan Agreement, the Air Force loaned money to Western to pay off the construction loan. The terms of the Air Force loan were very favorable to Western. The amount of the loan was $28,850,000. The loan was nonrecourse, with a forty-year term and an annual interest rate of 1.43%. Western was required to pay interest only for the first ten years of the forty-year term. The principal amount of the loan was to be amortized over the last thirty years of the term. The loan from the Air Force to Western is referred to as the "Direct Loan" in the Use Agreement.

One of the primary disputes in this case involves Teel's interpretation of Section 4.02(c)(xiii) of the Lockbox Agreement. Based on that interpretation, Teel reduced his yearly indicated values of Quail Hollow by 40%. The Lockbox Agreement is a three-party agreement among Western, the Air Force, and Chase Manhattan, which is the Lockbox Agent under the Lockbox Agreement. The term of the Lockbox Agreement is to continue "until the expiration or earlier termination of the Use Agreement."

In the Lockbox Agreement, the parties agreed to establish various lockbox accounts. Among those accounts are (i) the Lockbox Revenue Account, (ii) the Impositions Reserve Account, (iii) the Replacement Reserve Account, (iv) the Reinvestment Account, (v) the Performance Deposit Account, (vi) the Tenant Security Deposit Account, (vii) the Debt Service

Reserve Account, and (viii) the Construction Escrow Account. The Use Agreement describes the nature and purposes of the various accounts. All income from Quail Hollow is to be deposited into the Lockbox Revenue Account. Funds for payment of Quail Hollow's annual taxes and insurance premiums are to be deposited into the Impositions Reserve Account. The purpose of the Replacement Reserve Account is to ensure that sufficient funds are available to cover the costs of major renovations and improvements during the term of the Use Agreement. Funds in the Reinvestment Account are to be used for the purposes of protecting and enhancing Quail Hollow through reinvestment in Quail Hollow. Funds in the Performance Deposit Account are to serve as security for Western's performance of its obligations under the Use Agreement. The purpose of the Debt Service Reserve Account is to ensure that funds are available for Western's payment of amounts due on its loan from the Air Force.

Under Section 4.02(c)(i) through (xiii) of the Lockbox Agreement, Chase Manhattan is required, on a monthly basis, to transfer funds from the Lockbox Revenue Account to thirteen accounts or categories in the following order of precedence and priority:

> (i) to the Management Company to pay Operating Expenses, the Operating Expenses set forth for such month in the Project Budget required to be filed pursuant to Section 5.02 hereof, including management fees payable to any Person who is not affiliated with, nor has an identity of interest with, the Borrower or any of the principals of the Borrower;

> (ii) to the Impositions Reserve Account, an amount equal to one-twelfth (1/12) of the annual taxes and insurance premiums set forth in the Project Budget;

> (iii) to the Replacement Reserve Account, an amount equal to one-twelfth of the amount required to be deposited annually in the Replacement Reserve Account pursuant to Section 4.04 hereof;

> (iv) to the Air Force, an amount equal to the monthly interest due on the Direct Loan (including any previously due, but unpaid amounts);

> (v) to the Air Force, an amount equal to the monthly principal due on the Direct Loan (including any previously due, but unpaid amounts);

> (vi) to the Performance Deposit Account, the amount necessary, if any, to increase the amount on deposit therein to, as applicable, during the relevant period as set forth in Section 4.05 below (1) $50,000, (2) $100,000, (3) $150,000, (4) $200,000, or (5) $250,000, as adjusted pursuant to Section 4.08 below.

(vii) Reinvestment Account A Deposit: Transfer to the Reinvestment Account of an amount equal to the Excess Rent (as defined in Section 9.5.c. of the Use Agreement), if any, for the previous month;

(viii) to the Management Company, an amount sufficient to pay the management fees payable to the Management Company or any other Person who is affiliated with, or has an identity of interest with, the Borrower or any of the principals of the Borrower;

(ix) to the Debt Service Reserve Account, the amount, if any, necessary to remedy any deficiency in the Debt Service Reserve Account so that the balance therein is not less than the Debt Service Reserve Requirement;

(x) to the Management Company, an amount sufficient to pay any extraordinary operating expenses (being Operating Expenses, including late fees, which are in excess of those budgeted pursuant to the current Project Budget) of the Property which have been approved by the Air Force;

(xi) Reinvestment Account B Deposit: Transfer to the Reinvestment Account of an amount for each completed unit (without regard to whether such unit is occupied) equal to (i) $1/12^{th}$ of $25 per unit for the period beginning on the first of the month after the disbursement of the Direct Loan and continuing until the first of the month before the 20th yearly anniversary of such disbursement and (ii) $1/12^{th}$ of $175 per unit for the period beginning on the first of the month after the 20th yearly anniversary of this Use Agreement and continuing until the end of the term of the Use Agreement. By written notice to the Project Owner the Air Force shall indicate on which date the Reinvestment Account B Deposits shall initially begin and on which date the amounts shall be increased as indicated in the preceding sentence;

(xii) to the Borrower, until the Preferred Return Balance is zero; and

(xiii) Reinvestment Account C Deposits After Receipt of Preferred Return. At such time as the outstanding Preferred Return Balance equals zero (determined in accordance with Section 9.7 below), any amounts remaining in the Lockbox Revenue Account after making the transfers or payments required by paragraphs (i) through (xii) above ("Net Cashflow") shall be deposited or paid as follows: 40% of Net Cashflow shall be deposited into the Reinvestment Account and the remaining 60% of Net Cashflow will be distributed to the Borrower.

The Preferred Return Balance consisted of equity contributed by Western to fund construction of Quail Hollow, plus interest on that amount. Thus, the twelfth category (xii) related to the return of Western's equity.

Under Section 4.02(c)(xiii) of the Lockbox Agreement, no Reinvestment Account C deposits were to be made until Western's equity balance (Preferred Return Balance) equaled zero. When that equity balance equaled zero, Chase Manhattan would be required to make Reinvestment Account C deposits from "any amounts remaining in the Lockbox Revenue Account after making the transfers or payments required by paragraphs (i) through (xii) above." Teel stated in his appraisal report that the Preferred Return Balance was retired in 2009. The evidence showed that, for each of the years 2002 through 2008, there had never been "any amounts remaining" in the Lockbox Revenue Account after Chase Manhattan made the transfers required by paragraphs (i) through (xii).

Scoggins testified that, because Western's Preferred Return Balance had been satisfied, there would in the future be amounts remaining in the Lockbox Revenue Account in the form of net cash flow for Reinvestment Account C deposits. Scoggins said that amortization of Western's loan from the Air Force would begin in 2012 and that, until that time, a significant amount of net cash flow would exist for Reinvestment Account C deposits because Western would be paying only interest on the note. Categories (iv) and (v) above require that the Air Force be paid amounts equal to the monthly interest due and monthly principal due on the Direct Loan. Scoggins said that, in 2012, the loan payment would increase significantly when Western's obligation to pay principal (category v) and interest (category iv) on the loan would start and that, correspondingly, the amount of net cash flow that could be available for Reinvestment Account C deposits (category xiii) would decrease significantly.

Teel assumed that market rate financing was in place for the purpose of arriving at his value opinions in his 2009 appraisal of Quail Hollow. He testified that it was highly unlikely that any funds would ever flow into Reinvestment Account C if a market rate loan existed instead of Western's actual 1.43% interest rate loan. Scoggins testified that, absent Western's favorable loan from the Air Force, no money would ever be available for deposit into Reinvestment Account C.

Section 4.05(a) of the Lockbox Agreement relates to the Reinvestment Account. It provides, in part, that "[t]he Reinvestment Account shall be used for the purpose of protecting and enhancing the Property through reinvestment in the Property in the form of quality of life improvement which will directly benefit the residents of the Property as determined by the Air Force pursuant to a reinvestment plan submitted by the Borrower or otherwise approved by the

11

Air Force." Section 4.05(a) of the Lockbox Agreement also provides, in part, that, "[u]pon the expiration or other termination of the Use Agreement or of this Lockbox Agreement, all amounts in the Reinvestment Account shall be transferred to, or as directed by, the Air Force in accordance with the Use Agreement."

Section 4.05(b) of the Lockbox Agreement requires a true-up of Reinvestment Account C deposits each quarter and annually. It provides as follows:

> (b) Net Cashflow shall be reconciled on a quarterly and annual basis in accordance with the actual operating statements of the Property submitted under Section 5.02 hereof. If the aggregate of the monthly deposits required pursuant to Section 4.03(c)(xiii) hereof is less than twenty (20%) of the actual Net Cashflow as set forth in the annual or quarterly financial statement for the Property, the Borrower shall deposit any such shortfall into the Reinvestment Account within 30 days of becoming aware of such shortfall. If the aggregate of such monthly deposits is more than twenty percent (20%) of the actual Net Cashflow as set forth in the annual or quarterly financial statement for the Property, any such excess shall be released from the Reinvestment Account to the Borrower within 30 days of the Air Force being provided with a financial statement that demonstrates such excess to the Air Force's reasonable satisfaction.

Teel's and Scoggins's summary appraisal reports were introduced into evidence, and Teel and Scoggins testified in detail regarding their appraisals and opinions of value of Quail Hollow. Teel's report was dated September 29, 2009; Scoggins's report was dated January 4, 2010. In performing their appraisals, Teel and Scoggins both considered the effect of the rental and occupancy restrictions on Quail Hollow's market value. Teel stated in his report that "[t]he Scope of this appraisal is directed toward development of an appraisal reported in a summary format to develop an opinion of the retrospective market value of the subject property as of January 1, 2002 through 2008, subject to the Lockbox Agreement and [Use Agreement]." Scoggins stated in his report that "[t]he purpose of this appraisal is to provide our opinion of the retrospective market values of the fee simple interest of the property in question as encumbered by the [Use Agreement] and related documents."

Teel did not consider the favorable financing terms that Western received under the Direct Loan from the Air Force in arriving at his opinions of value. Scoggins gave two opinions of value for each year. One of Scoggins's opinions of value included the value that Scoggins attributed to the favorable financing that Western received from the Air Force. Scoggins's other opinion of value did not include the value of favorable financing.

In performing their appraisals, Teel and Scoggins both used the Tax Code's definition of "market value."[2] They both considered the three statutory appraisal methods: (1) the cost approach, (2) the income approach, and (3) the market data (sales) comparison approach.[3] Teel and Scoggins both used the direct capitalization method of the income approach in arriving at opinions of Quail Hollow's market value.[4]

As stated above, the direct capitalization method of the income approach involves dividing a property's net operating income (NOI) by an applicable market capitalization rate (cap rate) to arrive at the property's market value.[5] Thus, the income approach requires an appraiser to determine the property's NOI and the applicable cap rate. Because Teel and Scoggins appraised Quail Hollow on a "retrospective" basis, they had actual financial statements of Quail Hollow, as well as rental income and expense reports showing actual rentals and expenses, for each of the years they appraised. They arrived at very similar NOI amounts for each of the years. For example, for 2003, Teel arrived at an NOI in the amount of $1,449,107, and Scoggins arrived at an NOI of $1,444,002. Therefore, in 2003, Teel's and Scoggins's NOIs differed by about 0.35%.

To determine applicable cap rates, Teel and Scoggins researched market data. A market cap rate may be established by analyzing sales of properties that are similar to the subject property. The market cap rate is calculated by dividing the sold properties' net operating

---

[2]"Market value" means the price at which a property would transfer for cash or its equivalent under prevailing market conditions if:

> (A) exposed for sale in the open market with a reasonable time for the seller to find a purchaser;
> (B) both the seller and the purchaser know of all the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions on its use; and
> (C) both the seller and purchaser seek to maximize their gains and neither is in a position to take advantage of the exigencies of the other.

TEX. TAX CODE ANN. § 1.04(7) (West 2008).

[3]*See* TEX. TAX CODE ANN. §§ 23.011–.013 (West 2008 & Supp. 2011); *Houston R.E. Income Props. XV, Ltd. v. Waller Cnty. Appraisal Dist.*, 123 S.W.3d 859, 861 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

[4]Use of the income approach is appropriate where, as here, the property would in the open market be priced according to the rental income it generates. *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 183 (Tex. 2001); *Destec Props. Ltd. P'ship v. Freestone Cent. Appraisal Dist.*, 6 S.W.3d 601, 605 (Tex. App.—Waco 1999, pet. denied).

[5]Under the income approach, the present value of an income-producing property is calculated by estimating the property's future income and applying a capitalization rate to that income to determine market value. *Polk Cnty. v. Tenneco, Inc.*, 554 S.W.2d 918, 921 (Tex. 1977); *City of Dallas v. Redbird Dev. Corp.*, 143 S.W.3d 375, 384 (Tex. App.—Dallas 2004, no pet.). The capitalization rate is the rate of interest investors would require as a return on their money before they would invest in the income-producing property, taking into account all the risks involved in that particular enterprise. *Redbird*, 143 S.W.3d at 384.

incomes by the sales prices of the properties. The market cap rate quantifies risk factors that are involved in owning real estate, such as return on investment, economy, unemployment, the community's perception of the property, natural catastrophes, availability of funds for construction, undesirable developments in the neighborhood, and overdevelopment in the neighborhood. Debt service is a component of the market cap rate.

Teel and Scoggins arrived at similar market cap rates for each of the years in question. For example, in 2003, Teel's market cap rate was 8.5%, and Scoggins's market cap rate was 8.75%. For each of the years, Scoggins's market cap rate exceeded Teel's market cap rate by 0.25%. After deriving the market cap rates, Teel and Scoggins added the Taylor County tax rates to their market cap rates for each of the years.

The similarities between Teel's and Scoggins's methodologies in performing their appraisals ended at this point. In 2003, the Taylor County tax rate was 2.7026%. When Scoggins added the tax rate of 2.7026% to his market cap rate of 8.75%, he arrived at an overall cap rate of 11.4526%. He then divided Quail Hollow's NOI of $1,444,002 by his overall cap rate of 11.4526% to arrive at a rounded indicated value for 2003 of $12,600,000. Scoggins followed this methodology for each of the years to arrive at the following indicated values: $6,100,000 as of January 1, 2002; $12,600,000 as of January 1, 2003; $16,100,000 as of January 1, 2004; $17,000,000 as of January 1, 2005; $19,300,000 as of January 1, 2006; $21,700,000 as of January 1, 2007; and $20,900,000 as of January 1, 2008. These amounts did not consider the value of Western's favorable financing from the Air Force.

Scoggins testified that, ordinarily, market rents and typical market terms are considered when appraising the market value of the property. Scoggins said that, in performing appraisals, he would "almost never" consider the impact on value of such things as rent restrictions, favorable financing, and lockbox agreements. However, Scoggins testified that he believed our opinion in *Western I* "mandated that those items be considered in this case." Therefore, Scoggins said that a "jurisdictional exception" governed his appraisal in this case. He also said that, but for the jurisdictional exception, he would not have considered the rent restrictions and favorable financing in arriving at his conclusions of value.

In his appraisal report, Scoggins stated that "[a] jurisdictional exception is defined as an assignment condition that voids the force of part or parts of [USPAP], when compliance with part or parts of USPAP is contrary to public policy applicable to the assignment." Essentially,

Scoggins believed that, if the rent restrictions had to be considered as an individual characteristic in performing the appraisal, the favorable financing also had to be considered as an individual characteristic. Scoggins explained as follows in his appraisal report:

> In [*Western I*], the court ruled that a property characteristic is a factor unique to a specific property which is a major component of its exchange value. Since both restricted rents and favorable financing are necessary components contributing to project feasibility, the final value opinions reported herein reflect the impact of both restricted rents and occupancies and the favorable financing as part of the land use agreement treating same as specific "property characteristics". One without the other would not have achieved the desired development result due to the cost to construct versus the anticipated insufficient revenue returns on a purely market basis.

Therefore, Scoggins considered Western's favorable financing from the Air Force to be a property characteristic of Quail Hollow that affected its market value.

Scoggins calculated the value of the favorable financing and then added that value to his indicated values for each of the years. With the favorable financing considered, Scoggins arrived at the following retrospective market values for Quail Hollow: $16,000,000 as of January 1, 2002; $32,300,000 as of January 1, 2003; $35,500,000 as of January 1, 2004; $36,000,000 as of January 1, 2005; $38,000,000 as of January 1, 2006; $40,000,000 as of January 1, 2007; and $38,700,000 as of January 1, 2008.

Teel made an "extraordinary assumption" in performing his 2009 appraisal of Quail Hollow. Teel stated in his report that "extraordinary assumption" is defined in USPAP as follows:

> [A]n assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.

In his report, Teel described the "extraordinary assumption" as follows:

> The subject property is restricted due to a [Lockbox Agreement] and [Use Agreement], each . . . expiring in August 2042. The Lockbox Agreement restricts rental rates and the overall operation of the property for a 40 year period. The **retrospective** opinions of value have been formed based on our understanding or interpretation of these documents, including but not limited to, rental rate restrictions, property operations and assignment of funds in Reinvestment Accounts A, B and C.

During his testimony, Teel explained the effect that an extraordinary assumption has on the appraisal process. He said that "[t]he extraordinary assumption says that everything that we're going to do in the appraisal process in forming our opinion of value will start with the same way we would do it with a typical apartment project." He then said that, "[h]owever, the [appraisal process] becomes modified by this extraordinary assumption which says that the subject property is restricted by . . . a Lockbox Agreement and the [Use Agreement]."

Teel stated in his report that, due to Quail Hollow's rent restrictions, "an additional premium must be added to the overall capitalization rate derived from the conventional market-rate apartment sales." Teel also stated that overall capitalization rates for low-income housing apartments had been studied "to estimate the added premium applicable to the overall capitalization rate for the subject improvements." Based on his analysis, Teel added 250 basis points (2.5%) as a "restriction premium" to his market cap rate for each of the years. Therefore, for 2003, Teel arrived at what he referred to as a "loaded" cap rate of 13.7026% (8.5% market cap rate, plus 2.5% restriction premium, plus 2.7026% tax rate). By dividing his loaded cap rate into $1,449,107 (Quail Hollow's NOI), Teel arrived at a rounded indicated value of $10,575,415 as of January 1, 2003. Adding the 2.5% restriction premium to the cap rate had the effect of reducing the indicated value by about $2.3 million dollars ($1,449,107 divided by 11.2% [rounded cap rate without added restriction premium] equals $12,938,455). Teel's addition of the restriction premium to the cap rate had a similar effect on his indicated value for each of the years.

For each tax year, Teel reduced his indicated value of Quail Hollow by 40% based on his interpretation of Section 4.02(c)(xiii) of the Lockbox Agreement. Teel considered Section 4.02(c)(xiii) to be an individual characteristic of Quail Hollow that affected its market value. In his report, Teel explained the basis for his 40% reduction as follows:

> As stated, the subject's rental rates are governed by a Lockbox Agreement with [the Air Force] for a period of 40 years, expiring on August 31, 2042. A provision of the Lockbox Revenue Account in this Agreement, paragraph 4.02(c)(xiii), Reinvestment Account C, indicates that when the outstanding Preferred Return Balance equals zero, any amounts remaining in the Lockbox Revenue Account after making the transfers or payments required by paragraphs (i) through (xii), referred to as "Net Cashflow", shall be deposited or paid as follows:

16

> 40% of Net Cashflow shall be deposited into Reinvestment Account C and the remaining 60% of Net Cashflow will be distributed to the Borrower.
>
> The Preferred Return is an equity amount that was contributed by the borrower at closing to fund the construction of the subject property. The equity balance established by the Borrower per the Lockbox Agreement totaled $2,182,000. The equity balance increases by the addition of accumulated [sic] on the initial equity contribution at a monthly rate of 0.875% or 10.5% annually. The equity balance was retired in the spring of 2009, resulting in a zero balance.
>
> All Reinvestment Accounts are owned by the Air Force and the Air Force receives all balances in the Reinvestment Accounts when the Lockbox Agreement expires in 2042.
>
> Net Cashflow as defined in the Lockbox Agreement is basically synonymous with pre-tax cash flow or cash throw-off. Since the Borrower or property owner only receives 60% of the Net Cashflow after the Preferred Return Balance is retired, we have taken 60% of initial value conclusion for each year to account for the distribution or split of Net Cashflow between the borrow [sic] (property owner) and the Air Force per the Lock Box [sic] Agreement."

Thus, Teel multiplied his indicated values for each of the years by 60% to arrive at his opinion of final value. This approach reduced the indicated values by 40%, which amounted to reductions of millions of dollars in values for each year. For example, for 2003, Teel multiplied his indicated value of $10,575,415 by 60% to arrive at an opinion of value of $6,345,249, rounded to $6,350,000. Teel followed the same methodology for each year: he loaded the cap rate with a 2.5% restriction premium before arriving at an indicated value and then reduced his indicated value by 40% to account for a 60/40 Net Cashflow split between Western and the Air Force. Following this methodology, Teel arrived at the following retrospective market values for Quail Hollow: $2,610,000 as of January 1, 2002; $6,350,000 as of January 1, 2003; $8,170,000 as of January 1, 2004; $8,790,000 as of January 1, 2005; $9,530,000 as of January 1, 2006; $10,610,000 as of January 1, 2007; and $10,200,000 as of January 1, 2008.

In performing his 2004 appraisal of Quail Hollow, Teel neither added a "restriction premium" to his market cap rate nor reduced his opinion values by 40% based on an interpretation of the Lockbox Agreement. Little testified that, in his opinion, Teel used appropriate methodologies and techniques and arrived at appropriate opinions of market value in his 2009 appraisal of Quail Hollow.

17

*Admissibility of Expert Testimony and Standards of Review*

In its first two issues, TCAD challenges the reliability of Teel's and Little's testimony. An expert witness may testify regarding scientific, technical, or other specialized matters if the expert is qualified, if the expert's opinion is relevant, if the opinion is reliable, and if the opinion is based on a reliable foundation. TEX. R. EVID. 702; *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 637 (Tex. 2009); *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006); *Robinson*, 923 S.W.2d at 556. To be relevant, an expert's opinion must be based on the facts; to be reliable, the opinion must be based on sound reasoning and methodology. *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009); *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002). Conclusory or speculative opinion testimony is not relevant because it does not tend to make the existence of material facts more probable or less probable. *Whirlpool*, 298 S.W.3d at 637; *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004). Expert testimony that is based on unreliable data or flawed methodology is unreliable and does not satisfy the relevancy requirement. *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 234 (Tex. 2010); *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997). Further, expert testimony is unreliable if "there is simply too great an analytical gap between the data and the opinion proffered." *Gammill v. Jack Williams Chevrolet, Inc*., 972 S.W.2d 713, 727 (Tex. 1998) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Unreliable expert testimony is legally no evidence. *Havner*, 953 S.W.2d at 714; *Weingarten Realty Investors v. Harris Cnty. Appraisal Dist.*, 93 S.W.3d 280, 285 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

When expert testimony is involved, courts are to rigorously examine the validity of facts and assumptions on which the testimony is based, as well as the principles, research, and methodology underlying the expert's conclusions and the manner in which the principles and methodologies are applied by the expert to reach the conclusions. *Whirlpool*, 298 S.W.3d at 637; *Zwahr*, 88 S.W.3d at 629. An expert's conclusion might be unreliable, for example, if it is based on assumed facts that vary from the actual facts. *Whirlpool*, 298 S.W.3d at 637; *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995). Or, an expert's opinion might be conclusory if it is based on tests or data that do not support the conclusion reached. *Whirlpool*, 298 S.W.3d at 637; *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009). For expert testimony to be admissible, each material part of the expert's theory must be reliable. *Whirlpool*,

298 S.W.3d at 637; *Wilson v. Shanti*, 333 S.W.3d 909, 913 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). Thus, "the expert's testimony must be reliable at each and every step or else it is inadmissible." *Wilson*, 333 S.W.3d at 913 (quoting *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 355 (5th Cir. 2007)).

Once the party opposing expert testimony objects, the proponent of the expert testimony bears the burden of demonstrating its admissibility. *Robinson*, 923 S.W.2d at 557; *U.S. Renal Care, Inc. v. Jaafar*, 345 S.W.3d 600, 607 (Tex. App.—San Antonio 2011, pet. denied). The trial court's gatekeeping function under Rule 702 does not supplant cross-examination as the traditional means of attacking shaky but admissible evidence. *Gammill*, 972 S.W.2d at 728. But, neither does the availability of cross-examination relieve the trial court of its threshold responsibility under Rule 702 to ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. *Id.*

Generally, rulings on objections as to admissibility of evidence, including whether expert testimony is reliable, are reviewed for abuse of discretion. *Whirlpool*, 298 S.W.3d at 638. But, as TCAD does in this case, a party may assert on appeal that unreliable expert testimony is not only inadmissible but also legally insufficient to support a verdict. *Id.* Unlike review of a trial court's ruling as to admissibility of evidence where the ruling is reviewed for abuse of discretion, in a no-evidence review, we independently consider whether the evidence at trial would enable reasonable and fair-minded jurors to reach the verdict. *Id.*; *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Further, a no-evidence review encompasses the entire record, including contrary evidence tending to show the expert opinion is incompetent or unreliable. *Whirlpool*, 298 S.W.3d at 638; *City of Keller*, 168 S.W.3d at 813.

*Opinions of Western's Experts*

TCAD contends that Teel's value opinions lacked a reliable foundation because Teel (1) arrived at his 40% deduction of the values for each year as a result of an incorrect interpretation of the Lockbox Agreement, (2) arrived at his addition of a 2.5% "restriction premium" to his yearly cap rate as a result of incorrectly equating Quail Hollow with low-income housing complexes, and (3) failed to account for the effect of Western's favorable loan contract on Quail Hollow's yearly values.

*Teel's 40% Deduction of Values*

Teel explained the reasoning behind his 40% deduction in his report, and we have quoted that part of his report above. As shown above, Teel relied on Section 4.02(c)(xiii) of the Lockbox Agreement in arriving at his conclusion to deduct 40% of the values. Section 4.02(c)(i) through (xiii) requires Chase Manhattan to transfer funds from the Lockbox Revenue Account to thirteen other accounts or categories in an order of preference. The thirteenth and last of these categories (xiii) requires Chase Manhattan to make Reinvestment Account C deposits. Section 4.02(c)(xiii) applies to "any amounts remaining in the Lockbox Revenue Account" after Chase Manhattan has made the transfers or payments required by paragraphs (i) through (xii). The obligation to make Reinvestment Account C deposits from "any amounts remaining in the Lockbox Revenue Account" did not arise until the Preferred Return Balance (category xii), which related to the return of Western's equity in Quail Hollow, equaled zero. According to Teel, Western's equity balance was retired in 2009. The term "any amounts remaining" is defined as "Net Cashflow." Pursuant to Section 4.02(c)(xiii), Chase Manhattan must deposit 40% of Net Cashflow into the Reinvestment Account and pay the remaining 60% to Western.

Teel also relied on Section 4.05(a) of the Lockbox Agreement in support of his conclusion to deduct 40% of the yearly values. Section 4.05(a) provides, in part, that, when either the Use Agreement or Lockbox Agreement expires or terminates, "all amounts in the Reinvestment Account shall be transferred to, or as directed by, the Air Force in accordance with the Use Agreement." Based on Section 4.05(a), Teel concluded that "[a]ll Reinvestment Accounts are owned by the Air Force and the Air Force receives all balances in the Reinvestment Accounts when the Lockbox Agreement expires in 2042."

Teel interpreted Section 4.02(c)(xiii) to provide that Western could receive only 60% of Net Cashflow because the Air Force owned the other 40% of Net Cashflow that was deposited into Reinvestment Account C. In his report, Teel explained that, "[s]ince the Borrower or property owner only receives 60% of the Net Cashflow after the Preferred Return Balance is retired, we have taken 60% of initial value conclusion for each year to account for the distribution or split of Net Cashflow between the borrow [sic] (property owner) and the Air Force per the Lock Box [sic] Agreement."

Teel's 60/40 split of Net Cashflow did not take into account the required quarterly and annual true-ups of Reinvestment Account C deposits under Section 4.05(b) of the Lockbox

Agreement. As stated above, Section 4.05(b) provides that Net Cashflow is to be reconciled on a quarterly and annual basis. It further provides that, if the aggregate of the monthly Reinvestment Account C deposits "is more than twenty percent (20%) of the actual Net Cashflow . . . , any such excess shall be released from the Reinvestment Account to the Borrower." Thus, after the required true-ups, Reinvestment Account C deposits of 40% of estimated Net Cashflow are reduced to 20% of actual Net Cashflow. The true split of Net Cashflow, to the extent any Net Cashflow exists, is 80% to Western and 20% to the Air Force. Teel's 40% reduction of values was based on an incorrect interpretation of the Lockbox Agreement; therefore, his value opinions are not based on a reliable foundation. Because the foundational data underlying Teel's opinions is unreliable, the value opinions that he drew from that data are likewise unreliable, and his testimony is legally no evidence to support the jury's verdict. *Weingarten*, 93 S.W.3d at 285.

In its response brief, Western does not argue that Teel's interpretation of the Lockbox Agreement is correct. Rather, Western asserts that our opinion in *Western I* required Teel and Scoggins "to alter the methodology they would have ordinarily employed," "to alter their normal appraisal methods," "to eschew traditional appraisal methods," and "to consider and interpret the contract documents." Western contends that, because this court required the appraisers to interpret the contract documents, Teel's interpretation of those documents "goes to the weight, not the admissibility, of [his] testimony."

In *Western I*, Western argued, and we held, that the Texas Tax Code and USPAP required the appraisers to consider the rent and occupancy restrictions in appraising Quail Hollow. Although Western made such an argument in *Western I*, Western now contends that our holding in *Western I*, which involved only the rental and occupancy restrictions, required the appraisers "to eschew traditional appraisal methods." Western's positions appear to be in conflict, and our opinion in *Western I* certainly did not require the appraisers "to eschew traditional appraisal methods." Nor did we order or require them to "interpret" the contract documents. Even if we had required the appraisers to interpret the contract documents, the appraisers' expert testimony would need to satisfy reliability requirements to be admissible. Reliability is an issue of admissibility for the trial court, not a weight-of-the-evidence issue for the factfinder. *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 590 (Tex. 1999); *City of Sugar Land v. Home & Hearth Sugarland, L.P.*, 215 S.W.3d 503, 511 (Tex. App.—Eastland 2007, pet. denied). An expert opinion that is based on an erroneous interpretation of a contract is not reliable.

21

Even assuming that Teel's interpretation of Section 4.02(c)(xiii) of the Lockbox Agreement is correct, there is no factual data to support Teel's conclusion that Section 4.02(c)(xiii) is an individual characteristic of Quail Hollow that negatively affects its market value by any amount, much less by 40%. The evidence showed that, through 2008, no Reinvestment Account C deposits had been made. Scoggins explained that significant amounts of Net Cashflow would be available for Reinvestment Account C deposits beginning in 2009 when Western's Preferred Return Balance was satisfied and ending in 2012 when Western's obligation to pay principal on the loan would start. Scoggins said that, after that time period, the amount of Net Cashflow would decrease significantly. The evidence also showed that, if market rate financing existed on Quail Hollow, as was assumed by Teel in his appraisal, it is highly unlikely that there would ever be any funds available for Reinvestment Account C deposits. Teel stated in his report that the Air Force owned all the reinvestment accounts and would receive all balances in the accounts when the Lockbox Agreement expires in 2042. However, the evidence showed that funds in the reinvestment account are to be used for reinvesting in Quail Hollow. Air Force Colonel Rodney L. Croslen testified that "[t]he funds in the reinvestment accounts are intended to be reinvested in the project for the purpose of providing quality housing for the Dyess Air Force personnel." Similarly, the Lockbox Agreement provides that "[t]he Reinvestment Account shall be used for the purpose of protecting and enhancing the Property through reinvestment in the Property." Section 5.3 of the Use Agreement requires Western to "renovate, replace, [and/or] revitalize" Quail Hollow from about 2025 to 2030. Section 9.5d of the Use Agreement contemplates that funds in the Reinvestment Account will be reinvested in Quail Hollow. It provides that "[t]he funds on deposit in the Reinvestment Account shall, subject to the Air Force's consent, be disbursed by [Chase Manhattan] for the benefit of [Quail Hollow] in accordance with a reinvestment plan developed by [Western] and accepted by the Air Force."

It is speculative to conclude that funds will remain in the Reinvestment Account when the Use Agreement terminates. Reinvesting funds in Quail Hollow should have the effect of increasing the amount of income it produces. Teel's opinion that Section 4.02(c)(iii) negatively affects Quail Hollow's market value is not supported by facts. Because no factual data supported a deduction of 40% of Quail Hollow's value for each year, Teel's testimony amounted to no

more than his "subjective belief or unsupported speculation" and, as such, was unreliable and inadmissible. *Zwahr*, 88 S.W.3d at 629; *Gammill*, 972 S.W.2d at 727–28.

Finally, we conclude that Teel should not have considered the Lockbox Agreement in determining Quail Hollow's market value for an independent, fundamental reason. As stated above, under the income approach, the property's net operating income (NOI) is divided by the applicable capitalization rate (cap rate) to arrive at the property's market value. The evidence showed that, unlike the rental and occupancy restrictions, the terms of the Lockbox Agreement do not affect Quail Hollow's ability to produce income. Instead, the Lockbox Agreement governs cash flow after income has been produced. NOI, not Net Cashflow, is used in determining market value under the income approach of appraisal. Because the Lockbox Agreement does not affect Quail Hollow's income-producing ability, we conclude that it is not an "individual characteristic" of Quail Hollow that affects its market value. Therefore, the Lockbox Agreement should not be considered in determining Quail Hollow's market value.

*Teel's Addition of the 2.5% "Restriction Premium"*

In his analysis, Teel equated Quail Hollow with low-income housing. Because Quail Hollow has rent restrictions, Teel concluded that "an additional premium must be added to the overall capitalization rate" to derive its market value. Teel then studied overall capitalization rates for low-income housing apartments that were published by the TCAD and appraisal districts in other counties to determine his "restriction premium." Based on his analysis, he added the 2.5% restriction premium to his market cap rate for each of the years.

Western contends in its appellate brief that "[t]here was no error in loading the overall capitalization rate with an additional 2.5 percent (2.5%) because Quail Hollow is the equivalent of a low income housing complex." Western cites Section 11.1825(q)(2) of the Tax Code in its brief for the proposition that "it was perfectly reasonable that Teel considered the capitalization rates published by surrounding appraisal districts in determining the capitalization rate he used." *See* TEX. TAX CODE ANN. § 11.1825(q)(2) (West Supp. 2011).

Section 11.1825 of the Tax Code provides qualifying organizations with an exemption from taxation of certain properties that are used to provide low-income housing to individuals or families meeting income eligibility requirements. *Id.* § 11.1825(a). For property to be exempt under Section 11.1825, the organization must, among other things, rent the housing "to individuals or families whose median income is not more than 60 percent of the greater of . . . the

23

area median family income . . . or the statewide area median family income." *Id.* § 11.1825(f)(1). In appraising property that qualifies for exemption under Section 11.1825, the chief appraiser is required to "use the same capitalization rate that the chief appraiser uses to appraise other rent-restricted properties." *Id.* § 11.1825(q)(2).

Section 23.21 of the Tax Code governs appraisals of properties that are used to provide housing to low-income individuals or families meeting certain eligibility standards. *Id.* § 23.21. Western alleged in its petition that Quail Hollow "qualifie[d] for appraisal as affordable housing under section 23.21 of the [Tax] Code." Western did not allege that Quail Hollow was exempt from taxation under Section 11.1825. In its petition, Western quoted language from Section 23.21(b). Section 23.21(b) provides as follows:

> In appraising real property that is rented or leased to a low-income individual or family meeting income-eligibility standards established by a governmental entity or under a governmental contract for affordable housing limiting the amount that the individual or family may be required to pay for the rental or lease of the property, the chief appraiser shall take into account the extent to which that use and limitation reduce the market value of the property.

Western requested in its petition that the trial court determine Quail Hollow's market value under Section 23.21.

Western abandoned its Section 23.21 claim before trial. At a pretrial hearing, Western's counsel agreed to nonsuit its affordable housing claim. Western's counsel also represented to the trial court that Western was not pursuing a claim that Quail Hollow was exempt from taxation as affordable housing under Section 11.1825. In its appellate brief, Western states that "[it] stipulated that Quail Hollow is not low income housing." Additionally, the evidence showed that Quail Hollow does not qualify as affordable housing or low-income housing. The amount of an individual's or family's income is not a criteria for renting units at Quail Hollow. Individuals and families need not meet income eligibility requirements to rent units at Quail Hollow. Instead, the amount of rent that can be charged at Quail Hollow to a targeted tenant is tied to the tenant's BAH. By 2007 or 2008, the BAH exceeded market rental rates for apartments in Abilene. The evidence belies Western's contention that "Quail Hollow is the equivalent of a low income housing complex."

Section 11.1825 does not apply in this case for a number of reasons. One such reason is that Quail Hollow is not used to provide low-income housing to individuals or families meeting

income eligibility requirements. *Id.* § 11.1825(a). Because Section 11.1825 does not apply, it provides no support for Teel's addition of the 2.5% restriction premium to his market cap rate. The evidence showed that Teel's addition of the restriction premium was based, at least in large part, on the incorrect premise that Quail Hollow is the equivalent of a low-income housing complex. Therefore, Teel's addition of the 2.5% "restriction premium" was based on an unreliable foundation, the value opinions that he drew from that foundation were likewise unreliable, and his testimony constituted no evidence to support the jury's verdict. *Havner*, 953 S.W.2d at 714; *Weingarten*, 93 S.W.3d at 285.

*Teel's Failure to Consider Western's Favorable Financing*

The evidence showed that, ordinarily, appraisers consider market rents and typical market terms when determining the market value of a property. Usually, they do not consider the impact that existing, atypical financing might have on the property's value. Scoggins said that he had "[a]lmost never" concluded in an appraisal that a loan impacted the property's value. However, he viewed our opinion in *Western I* as a "jurisdictional exception" that required him to depart from standard appraisal practices. He testified that, but for the "jurisdictional exception," he would not have considered the rent restrictions or the favorable loan contract in his conclusions of value. Relying on *Western I*, TCAD argues that, if the rent and occupancy restrictions are individual characteristics of Quail Hollow that must be considered in determining its market value, then Western's favorable financing is also an individual characteristic that must be considered in determining Quail Hollow's market value. TCAD states in its brief that the Loan, Use, and Lockbox Agreements are "inseparable parts of a contract" and that "one cannot be considered without the other[s]."

We see a significant distinction between the restrictions and the favorable financing. The rent and occupancy restrictions are covenants that run with the land for the entire forty-year term of the Use Agreement. One aspect of the definition of "market value" in the Tax Code provides that "both the seller and the purchaser know of all . . . enforceable restrictions on [the property's] use." TEX. TAX CODE ANN. § 1.04(7)(B) (West 2008). USPAP requires an appraiser to "identify the characteristics of the property that are relevant to the purpose and intended use of the appraisal," including "any known . . . restrictions, encumbrances, . . . or other items of a similar nature." USPAP Rule 1-2(e)(iv). The rent and occupancy restrictions directly affect the ability of Quail Hollow to produce income. A willing buyer would not buy Quail Hollow for a price

that is based on an amount of rent that cannot actually be collected because of the restrictions. Quail Hollow should not be valued as though a buyer would not consider the restrictions. Thus, the rent and occupancy restrictions should be considered when determining Quail Hollow's market value.

Conversely, Western's favorable financing does not affect Quail Hollow's ability to produce income. In our analysis, we find it important to consider the nature of the rights created by favorable financing agreements. Western's right to receive favorable financing arose from its contract with the Air Force. Borrowers benefit from below-market rate loans in the form of paying less interest expense than they would on a market rate loan. In this case, Western saves substantial interest expense. The interest savings result from Western's favorable financing contract. They do not result from income generated by Quail Hollow. Favorable financing contracts fall within the definition of "intangible personal property" in the Tax Code. Specifically, Section 1.04(6) of the Tax Code provides in relevant part as follows:

> "Intangible personal property" means a claim, interest . . . , right, or other thing that has value but cannot be seen, felt, weighed, measured, or otherwise perceived by the senses, although its existence may be evidenced by a document. It includes a . . . note . . . [or] contract.

TEX. TAX CODE ANN. § 1.04(6) (West 2008). Except for intangible property that is governed by certain provisions in the Insurance Code and Finance Code that do not apply here, "intangible personal property is not taxable." *Id.* § 11.02(a), (b). Western's favorable financing rights are "intangible personal property," and they are not taxable. Because Western's interest savings result from its nontaxable favorable financing agreement and because those savings do not affect Quail Hollow's ability to produce income, we conclude that Western's favorable financing should not be considered in determining Quail Hollow's market value.

In its brief, TCAD cites out-of-state cases to support its contention that, if the rental and occupancy restrictions are considered in determining Quail Hollow's market value, Western's favorable financing must also be considered.[6] The cases cited by TCAD involved government

---

[6]*See Bontrager v. Siskiyou Cnty. Assessment Appeals Bd.*, 118 Cal. Rptr. 2d 182 (Cal. Ct. App. 2002); *Kankakee Cnty. Bd. of Review v. Prop. Tax Appeals Bd.*, 544 N.E.2d 762 (Ill. 1989); *New Walnut Square Ltd. P'ship v. Louisiana Tax Comm'n*, 626 So. 2d 430 (La. App. 1993); *Meadowlanes Ltd. Dividend Hous. Ass'n v. City of Holland*, 473 N.W.2d 636 (Mich. 1991); *Schuyler Apartment Partners, LLC v. Colfax Cnty. Bd. of Equalization*, 783 N.W.2d 587, 591–92 (Neb. 2010); *Church Street Assocs. v. Cnty. of Clinton*, 959 A.2d 490 (Pa. Commw. Ct. 2008); *Town Square Ltd. P'ship v. Clay Cnty. Bd. of Equalization*, 704 N.W.2d 896 (S.D. 2005).

subsidized low-income housing complexes and affordable housing complexes. In those cases, the courts held that government incentives, such as low-interest loans or tax credits, should be considered in determining the subject properties' market value.[7]

In *Town Square*, which is one of the cases cited by TCAD, the court recognized that several courts have held "that the restricted rental rates should be used without consideration of the tax credits or other subsidies." *Town Square*, 704 N.W.2d at 901. For example, courts have held that tax credits should not be considered in determining a property's market value because they are nontaxable intangible personal property. *Cottonwood Affordable Hous. v. Yavapai Cnty.*, 72 P.3d 357, 359 (Ariz. Tax Ct. 2003); *Cascade Court Ltd. P'ship v. Noble*, 20 P.3d 997, 1002 (Wash. Ct. App. 2001). Similarly, because Western's favorable financing is intangible personal property and nontaxable under the Tax Code, it should not be considered in assessing Quail Hollow's market value. Therefore, this case is distinguishable from the cases on which TCAD relies in its brief.

Western's savings of interest expense is attributable to its favorable financing. The favorable financing does not have a direct effect on the income produced by Quail Hollow. As such, Western's favorable financing is not an "individual characteristic" of Quail Hollow that affects its market value. For this reason, Teel was correct not to include a value for Western's favorable financing in his value conclusions. For the same reason, Scoggins should not have included the value of favorable financing in his value conclusions.

*Conclusion*

For the reasons stated above, we have concluded that Teel's value opinions were unreliable and that, therefore, his testimony constituted no evidence to support the jury's verdict. Little testified that Teel used appropriate methodologies and techniques in performing his 2009 appraisal and that Teel arrived at appropriate opinions of Quail Hollow's market value. Because Teel's testimony was unreliable, Little's testimony was also necessarily unreliable. The trial court abused its discretion by failing to exclude Teel's and Little's unreliable testimony and reports.

Teel's and Little's testimony was the only evidence of the market values found by the jury. Because their testimony was unreliable, there was no evidence to support the jury's value

---

[7]*Bontrager*, 118 Cal. Rptr. 2d at 186–87; *Kankakee*, 544 N.E.2d at 769; *New Walnut Square*, 626 So. 2d at 432; *Meadowlanes*, 473 N.W.2d at 648–49; *Schuyler*, 783 N.W.2d at 591–92; *Church Street*, 959 A.2d at 497–98; *Town Square*, 704 N.W.2d at 902–03.

findings. Therefore, the evidence is legally insufficient to support the jury's verdict, and the trial court's judgment must be reversed. *Whirlpool*, 298 S.W.3d at 643. TCAD's first two issues are sustained.

*Remedy on Appeal*

In its third issue, TCAD contends that the trial court erred by denying its motion for judgment notwithstanding the verdict and its motions for new trial because there was no evidence to support the jury's verdict. The standard of review for a JNOV is the same as that for a directed verdict. *Rush v. Barrios*, 56 S.W.3d 88, 94 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). A JNOV is proper if there is no evidence to support an issue or, conversely, the evidence establishes an issue as a matter of law. *Exxon Corp. v. Quinn*, 726 S.W.2d 17, 19 (Tex. 1987); *Rush*, 56 S.W.3d at 94. We review the trial court's denial of a motion for new trial under an abuse of discretion standard. *In re R.R.*, 209 S.W.3d 112, 114 (Tex. 2006).

Rule 43.2(c) of the Rules of Appellate Procedure provides that "[t]he court of appeals may reverse the trial court's judgment in whole or in part and render the judgment that the trial court should have rendered." TEX. R. APP. P. 43.2(c). TCAD asserts that we should reverse the trial court's judgment and render judgment valuing Quail Hollow at the values testified to by Scoggins. Scoggins provided two opinions of value for each year. In one opinion, Scoggins included the value of Western's favorable financing in his market value conclusions. In the other opinion, Scoggins did not include a value of the favorable financing. For the reasons stated above, Scoggins should not have included a value of Western's favorable financing in his value conclusions. Therefore, his value opinions that included the value of the favorable financing constituted no evidence of Quail Hollow's market value. Scoggins's value opinions that did not include a value attributable to Western's favorable financing constituted some evidence of Quail Hollow's market value for the years in question. However, his testimony as to those values did not conclusively establish Quail Hollow's market value. Therefore, we cannot render judgment based on Scoggins's testimony.

As explained in detail above, Teel's value opinions were unreliable because he added the "restriction premium" to his market cap rate for each year and because he deducted 40% of Quail Hollow's value for each year. In the absence of these two unreliable methodologies, Teel's appraisal provided some evidence of Quail Hollow's market value for the years in question. Had Teel not added the "restriction premium" and deducted 40% of Quail Hollow's value, his value

opinions would be similar to Scoggins's value opinions that did not include a value for Western's favorable financing:

| | Scoggins (without favorable financing): | Teel (without 2.5% load and 40% deduction): |
|---|---|---|
| 2002 | $6.1 million | $6.5 million |
| 2003 | $12.6 million | $12.9 million |
| 2004 | $16.1 million | $16.8 million |
| 2005 | $17 million | $18.2 million |
| 2006 | $19.3 million | $20 million |
| 2007 | $21.7 million | $22.6 million |
| 2008 | $20.9 million | $21.6 million |

For simplicity, the values in the above table have been rounded.

Although there was no evidence to support the jury's findings, the admissible evidence established that Quail Hollow had some market value for each of the years in question. The evidence would have supported findings of Quail Hollow's market value for each of the years. Thus, this case does not involve the situation where there is no evidence to support a finding on the issue of market value. Instead, the evidence supports the conclusion that, for each of the years, considering the rent and occupancy restrictions, Quail Hollow's fair market value was in the range of values listed in the above table. For example, for 2003, the evidence would support a finding that Quail Hollow's market value was in the range of $12.6 million to $12.9 million. While these values are similar, the trial court could not have granted TCAD's motion for JNOV and rendered a judgment based on the $12.6 million value or the $12.9 million value because neither value was conclusively proved by the evidence. Because the trial court could not render such a judgment, the trial court did not err by denying TCAD's motion for JNOV, and we cannot render judgment under Rule 43.2(c) of the Rules of Appellate Procedure. However, because the evidence is legally insufficient to support the jury's verdict, we conclude that the trial court abused its discretion by denying TCAD's motions for new trial. A remand is necessary for further proceedings in the trial court. *See* TEX. R. APP. P. 43.3(a). TCAD's third issue is sustained to the extent it challenges the trial court's denial of its motions for new trial.

*Attorney's Fees*

In its fifth issue, TCAD contends that the trial court erred by awarding attorney's fees to Western. The trial court awarded attorney's fees based on Section 42.29 of the Tax Code. TEX.

29

TAX CODE ANN. § 42.29 (West Supp. 2011). Because we reverse the trial court's judgment, we must also reverse the trial court's award of attorney's fees to Western. We remand the issue of attorney's fees to the trial court for further proceedings consistent with this opinion. TCAD's fifth issue is sustained.

*TCAD's Remaining Issue*

Based on our ruling on TCAD's first and second issues, we need not address TCAD's fourth issue complaining of the trial court's refusal to submit jury instructions.

*This Court's Ruling*

The judgment of the trial court is reversed, and this cause is remanded for further proceedings consistent with this opinion.


TERRY McCALL

JUSTICE


April 26, 2012

Panel consists of: Wright, C.J.,
McCall, J., and Kalenak, J.